449 So.2d 772 (1984)
MISSISSIPPI STATE DEPARTMENT OF PUBLIC WELFARE, State Capitol Commission and State of Mississippi
v.
Homer Lee Howie.
No. 54767.
Supreme Court of Mississippi.
March 14, 1984.
Rehearing Denied May 16, 1984.
Randall L. Miller, Jimmy G. Dedeaux, William Patterson, Jackson, for appellant.
Robert W. King, King & Spencer, Alfred N. Crisler, Crisler & Crisler, Jackson, for appellee.
Before PATTERSON, C.J., and HAWKINS and DAN M. LEE, JJ.
DAN M. LEE, Justice, for the Court:
This is an appeal from the Chancery Court of Hinds County wherein the chancellor found that the appellant, the Mississippi State Department of Public Welfare, was a holdover tenant on certain properties leased to it by the appellee, Homer Lee Howie. The chancellor ruled that by holding over, the Department had extended the lease for a period of one year and that Howie was entitled to rent payments for that period. The chancellor also assessed attorneys fees and a 5% late fee required *773 under the lease. From that decision the State Department of Public Welfare brings this appeal, assigning numerous errors, many of which are repetitious. Because this cause must be reversed, we address only those issues which have some bearing on our decision.
On September 30, 1980, Homer Lee Howie filed a bill of complaint in the Chancery Court of Hinds County. Through his bill he charged the State Department of Public Welfare with holding over as a tenant. The bill sought specific performance of a lease renewal and rent in arrears based on the renewal of that lease. The Department of Public Welfare answered this complaint by filing a demurrer on February 10, 1981. At a hearing on this demurrer, the Department argued the defense of sovereign immunity and took the position that it could not be sued on the lease. Following the hearing the chancellor issued an opinion overruling the demurrer and holding that the doctrine of sovereign immunity is not a defense to a claim based on breach of contract.
Eventually the parties came to trial at which most of the facts were stipulated to in a document entitled "Undisputed Facts." In essence, those facts are as follows:
1. Homer Lee Howie was the owner of the land and office building in question.
2. On June 18, 1979, Howie and the Department of Public Welfare entered into a lease agreement whereby the Department of Public Welfare agreed to lease office space from Howie.
3. Prior to the execution of the lease agreement the State Capitol Commission had reviewed the lease and authorized the Department of Public Welfare to enter into the agreement.
4. The lease was executed on behalf of the Department of Public Welfare by Jack Byars in his official capacity as Commissioner of the Department.
5. Between May 12, 1980, and June 30, 1980, there was an exchange of correspondence between Howie and Donald B. Roark, the Commissioner of the State Department of Public Welfare who succeeded Jack Byars. Each of these letters appear in the record. The sum and substance of these letters is as follows:
A. On May 12, 1980, Howie wrote to Roark and attached two copies of a proposed lease which in essence was identical to the lease under which the Department of Public Welfare and Howie had been operating. This lease was intended to replace the one the parties were currently operating under when it expired. The sole change in terms was an increase in the amount of rent.
B. On June 5, 1980, Howie sent a letter to Roark to inform him that the lease under which they were operating expired on June 30, 1980, and the premises were demanded to be surrendered on that date.
C. On June 5, 1980, Roark wrote to Howie and acknowledged that the lease under which they were operating expired on June 30 1980. Roark stated that the Department would be moving to new facilities in downtown Jackson in early August, 1980. Therefore, he stated it was not the intent of the Department of Public Welfare to renew their lease but that they would like to negotiate terms for the Department to remain in the leased premises for a maximum of 60 days following the expiration of the lease. This was to be in order to facilitate the moving to new offices.
D. On June 23, 1980, Howie wrote to Roark. In this letter he submitted an attached lease proposal and expressly withdrew any previous proposal or negotiation. The attached lease was for a one month carryover under the same terms and conditions as the lease they were then operating under. Howie notified Roark that should Roark fail to execute and deliver this lease prior to 5:00 p.m. on June 30th and fail to vacate the premises by midnight June 30th, Howie would consider him a holdover tenant under the present lease. Howie notified Roark that should the Department fail to vacate the premises by 12:00 o'clock p.m. "By *774 operation of law the present lease will be renewed for a one year term under the same terms and conditions as contained in the present lease."
E. On June 27, 1980, Roark responded to Howie's last letter by stating it was a physical impossibility for him to deliver an executed lease prior to 5:00 o'clock on June 30th as the next scheduled meeting of the Capitol Commission was tentatively scheduled for July 8th. Roark informed Howie that he did not have the authority to enter into a new lease for any period of time without the specific approval of the Capitol Commission. Roark did indicate that he intended to request authority from the Capitol Commission for a one month holdover for the entire space and a 31 month lease of a smaller portion of that space. Roark again emphasized that there were no facilities in which the Department would be able to move by June 30th and that it would be necessary for them to remain in the subject property for a period of approximately 60 days in order to move all of their personnel and equipment.
6. The Department of Public Welfare did not vacate the leased premises prior to the end of the term of the lease on June 30, 1980 and continued to use and occupy the leased property until July 31, 1980, at which time the premises were vacated.
7. Between the dates of July 1, 1980 and September 24, 1980, there was a further exchange of correspondence between the parties. The sum and substance of those letters is as follows:
A. On July 2, 1980, Howie wrote to Roark and stated that he took the position that the Department of Public Welfare, by remaining in the premises beyond the termination of the lease period, had by operation of law, renewed the previous lease on the entire space for a period of one year under the same terms and conditions as the lease dated June 18, 1979. Howie did offer to accept a lease on a portion of the office space then occupied by the Department and release the Department from any obligations on the remaining portion of the lease. As a condition to this offer Howie demanded that the Department vacate all of the office space not contemplated by the proposed new lease and that the new lease be executed and delivered prior to July 10, 1980. Howie took the position that should the Department fail to meet these conditions the previous lease would remain in effect by operation of law for a period of one year.
B. On July 9, 1980, Roark wrote to Howie in response to Howie's letter of July 2nd. Roark informed Howie that at the scheduled meeting of the State Capitol Commission the Commission failed to approve the proposed amended lease. Roark informed Howie that the Commission had approved a continued occupancy of the entire office space for a one month period from July 1, 1980 through July 31, 1980 at a monthly rent equal to that under the expired lease. Roark also stated that the Capitol Commission would not approve the proposed lease of a portion of the office space. The Commission directed Roark to continue to negotiate for office space in Jackson as they considered the lease of a portion of the premises a new and separate lease requiring the submission of additional comparative property prospects.
C. On July 18, 1980, Roark wrote to Howie confirming that the entire office space would be vacated before midnight on August 1, 1980.
D. A second letter dated July 18, 1980, from Roark to Howie informed Howie whom the Department had selected as a mover to transport the Department's property.
E. On July 21, 1980, Howie wrote to Roark and stated that his position was the same as that stated in the letter of July 2, 1980. That is, that by operation of law the expired lease had been renewed as a result of the Department of Public Welfare's failure to vacate the premises upon the expiration of the previous lease. Howie did agree to submit a lease on a portion of the office space for a 22 month term and agreed to cancel *775 and release the remaining term of the present renewed lease if his proposed lease of part of the office space was executed and delivered prior to August 15th.
F. On July 28, 1980, Charles T. Kent, Director of Office of Business Services, wrote to Howie's building manager, Keith Pigott, to request photographs of the building to accompany the lease proposal regarding the diminished portion of office space.
G. On August 5, 1980, Roark wrote to Howie to confirm that on July 31, 1980, keys and control of the office space were turned over to Mr. Pigott.
H. On August 12, 1980, Roark wrote to Howie to inform him that the Capitol Commission had denied the Department's request to lease the diminished portion of Howie's office space.
I. On September 15, 1980, Howie wrote to Roark to acknowledge the receipt of certain vouchers from the State of Mississippi made payable to Howie. Howie again informed Roark that he considered the Department to be holding over and subject to the renewed lease by operation of law. Howie stated that he was fully reserving his rights to assert the renewed lease and depositing the above received vouchers. These vouchers were applied to rent for the month of July, 1980 and utility charges for the period from June 21, 1980 through July 18, 1980.
J. On September 24, 1980, Robert W. King wrote to Roark to notify him that he had been retained by Howie to represent him in the matter of delinquent lease rentals due under the renewed lease. King made a demand for delinquent rentals for the months of August and September, 1980, together with a 5% late charge and attorneys fees. King also stated that the rent for the month of October would be due on October 1st.
8. At all times between May 12, 1980 and September 4, 1980 Donald Roark was the Commissioner of the State Department of Public Welfare.
9. During the original period of the lease the State of Mississippi paid its rent by vouchers issued in the due course of business.
10. On July 11, 1980, the State of Mississippi issued vouchers numbered 0013906 and 0013903 to Howie. These are the vouchers acknowledged by Howie in his letter dated September 15th.
11. The State of Mississippi also issued vouchers numbered 0081523 and 0091415 which represented pro rata charges for Howie's operation and maintenance of the building, and parking lot and premises allocable to the Department's office space for the month of July, 1980.
12. The Capitol Commission approved on July 8, 1980, the Department continuing to occupy the space it had been occupying in Howie's building after June 30, 1980 and through July 31, 1980 and approved payment of rent for that period.
13. Prior to granting such approval, the Capitol Commission had been furnished copies of all of the correspondence between Roark and Howie up to that point.
14. Howie negotiated with several prospective tenants for a lease of portions of the demised premises but did not make a lease with such prospective tenants.
15. During the period from August 1, 1980 through June 30, 1981, Howie did lease certain portions of the space in his building formerly occupied by the Department who paid rent as follows: Travelers Insurance Co. rented 2,682.5 square feet at a rental of $1,900.10 per month through the month of June, 1981 for a total rent received of $19,001.00. Tennessee Gas rented 612 square feet for a period of December 8, 1980 through June 30, 1981 which generated rents totaling $3,387.10.
16. Howie has not filed a claim for his damages with the Mississippi State Auditor under § 7-7-33 of the Miss. Code Ann. (1972).
The only testimony offered at trial was that of Charles E. Hughes, an attorney at law. Mr. Hughes testified that he had been in a commercial practice since 1964 *776 and had reviewed the file of the immediate action. He stated that he thought that a contingent fee of one-third of any sum collected was a reasonable fee. Mr. Hughes acknowledged that he had no knowledge of the amount of time Howie's attorney had spent in preparation of the litigation. Hughes also testified that a contingent fee was not the only reasonable manner of billing in an action such as this.
Following the taking of all of the evidence the chancellor issued an opinion finding that the State Department of Public Welfare had renewed the expired lease by operation of law as a result of its holding over. The chancellor rendered a judgment in favor of Howie in the amount of $103,623.50, together with a 5% late charge provided for under the lease and interest from the due date of such rents. The chancellor also awarded attorneys fees in the amount of $20,000.
The threshold question of this appeal is whether the chancellor erred in failing to hold that the State Department of Public Welfare was immune from suit under the doctrine of sovereign immunity. The Department argues that as a governmental agency it is immune from legal liability. This question was originally presented in the form of a demurrer to Howie's bill of complaint. In a hearing on that demurrer the chancellor ruled that the doctrine of sovereign immunity does not apply where one is "seeking to exercise a property right that had its genesis in a solemn contract."
Recently, in Pruett v. City of Rosedale, 421 So.2d 1046 (Miss. 1982), this Court prospectively abolished the doctrine of sovereign immunity. The Pruett decision is applicable to the case sub judice only in a very limited fashion. First, Pruett was a tort action based on negligence.
Second, the Pruett decision expressly held that the abolition of sovereign immunity was relevant only to those claims, demands, actions or causes of action that accrue on or after July 1, 1984. Therefore, Pruett is helpful only in that it indicates that this Court looks upon the doctrine of sovereign immunity with disfavor.
A case more directly on point, though not precisely, is Cig Contractors v. Mississippi State Building Commission, 399 So.2d 1352 (Miss. 1981). In that case, Cig filed suit against the Mississippi State Building Commission seeking damages which were alleged to have resulted from the Commission's breach of contract. The contract called for Cig to construct a portion of the chemistry building at University of Mississippi. Cig was responsible for the concrete, masonry, and general contracting work on the project. The suit claimed that the Building Commission had breached its duty to test and inspect the soil and that such breach required Cig to remove and reconstruct portions of work they had already completed. The Building Commission asserted that it was not subject to suit because of sovereign immunity. In addressing this claim, reference was first made to Chapter 280 of the Laws of 1956 which set forth the powers granted to the State Building Commission. Among those powers are the authority "To contract and to be contracted with and to sue and be sued." The modern version of this code section is § 31-11-53 Miss. Code Ann. (1972).
It is important to note that in the statute which establishes the State Capitol Commission the express authority to sue and be sued is lacking. See § 29-5-1 Miss. Code Ann. (1972) in effect at the time of the lease agreement relevant to this appeal, and § 29-5-2 Miss. Code Ann. (Supp. 1983), the revised section.
Although there was statutory authority for holding that the State Building Commission was not protected by the doctrine of sovereign immunity, the opinion went further and indicated that the result was not likely to have been different absent such statutory authority:
Moreover, this writer doubts seriously that this Court would uphold a claim of sovereign immunity in contractual matters between a subdivision of the State and individuals doing business with it. The general rule is that when the legislature authorizes the State's entry into a *777 contract, the State necessarily waives its immunity from suit for a breach of such contract. 81A C.J.S. States § 172 (1977). Where the state has lawfully entered into a business contract with an individual, the obligations and duties of the contract should be mutually binding and reciprocal. There is no mutuality or fairness where a state or county can enter into an advantageous contract and accept its benefits but refuse to perform its obligations.
399 So.2d at 1355.
Based on the authority of Cig, the general law of contracts and common sense, we now hold that when the legislature authorizes the state's entry into a contract the state necessarily waives its immunity from suit for breach of that contract. Therefore, the doctrine of sovereign immunity does not protect the State Department of Public Welfare from being held liable on its contract and the chancellor's opinion in this regard was correct.
We next address whether the chancellor was correct in finding that by holding over, the Department of Public Welfare had renewed the expired lease. Essentially the question here is whether § 89-7-25 Miss. Code Ann. (1972), is the exclusive remedy available to a landlord whose tenant is holding over. That section provides as follows:
When a tenant being lawfully notified by his landlord, shall fail or refuse to quit the demised premises and deliver up the same as required by the notice, or when a tenant shall give notice of his intention to quit the premises at a time specified, and shall not deliver up the premises at the time appointed, he shall, in either case, thenceforward pay to the landlord double the rent which he should otherwise have paid, to be levied, sued for, and recovered as the single rent before the giving of notice could be; and double rent shall continue to be paid during all the time the tenant shall so continue in possession.
In all candor we acknowledge that our previous opinions on this subject have been somewhat less than consistent. In an effort to remedy those inconsistencies this opinion is intended to be dispositive on the issue.
The common law rule which Howie asserts and upon which the chancellor relied is expressed in the case of Tonkel v. Riteman, 163 Miss. 216, 141 So. 344 (1932):
It is firmly established that where, without a new contract, a tenant continues to occupy the property which he has held under an annual lease, he becomes liable as tenant for another year at the same rate and under the same terms. Love v. Law, 57 Miss. 596; Usher v. Moss, 50 Miss. 208. It is the duty of a tenant when his period of tenancy has expired to surrender the premises to his landlord or else to have procured a new contract, and, if he fails to do either, the landlord may treat him as a trespassor or as a tenant under the previous terms, according to the option of the landlord. In consequence of the foregoing principles, it is immaterial that the tenant may have notified the landlord that he will not renew the lease, or that he will remain only for a lesser period than that of the original lease or that he will pay a lesser amount in rent.
163 Miss. at 219, 141 So. at 344.
It is important to note that when Tonkel was decided the statutory predecessor to § 89-7-25 was in effect, although that decision failed to mention it. See Code of 1930 § 2225.
Six years later in Tepper Bros. v. Buttross, 178 Miss. 659, 174 So. 556 (1937), this Court again addressed the remedy available to a landlord whose tenant was holding over. In Tepper Bros. the appellants filed eviction proceedings against the appellee in the Mayor's Court in Canton. In that action they obtained a judgment of the property in statutory double rent. The appellee appealed to the circuit court and the appellants filed notice that they would demand double rent under § 2225. Judgment was rendered awarding the appellants possession of the property and $600 as double rent for the period of time the premises *778 were occupied after the expiration of this lease. While that action was proceeding, the appellants filed another declaration in circuit court seeking $2500 in actual damages (of which $360 was for rent) and $5,000 in punitive damages. After paying the judgment in the first cause the appellee pled estoppel and res judicata to the second suit. The appellants demurred to those pleadings and the demurrer was overruled. Upon those facts this Court held that the landlord may not recover both the double rent provided under § 2225 and damages in a separate action:
In our opinion, this statute affords an exclusive remedy as the measure of damages for holding over after notice to vacate. The statutory rule of construing laws is that where a statute enumerates the powers given, it must be held that it names all the powers dealt with therein, and that there is nothing implied. (authorities omitted)
178 Miss. at 664, 174 So. at 556.
More recently, in Crechale and Polles, Inc. v. Smith, 295 So.2d 275 (Miss. 1974), this Court indicated that it recognized the continued validity of the common law remedy of imposing a renewal of a lease on a holdover tenant but declined to apply the remedy in that case because of the landlord's actions which had amounted to an election to pursue another remedy. Therefore, our opinions have been a yes you can, no you can't, yes you can, response to this issue.
We now hold that § 89-7-25 was intended by the legislature to provide the sole action for damages as the result of a tenant's holdover.[1] The common law rule has been abrogated once and for all and may no longer be used to impose the renewal of an expired lease. Obviously we must reverse the chancellor's decision as it relates to this issue.
If Howie was not entitled to assert the renewed lease as the basis for his damages as we have held he may not, the question then arises what damages, if any, is he entitled to? To resolve this question we again refer to the case of Crechale and Polles, Inc. v. Smith, supra. In that case Crechale and Polles leased certain property to the Smiths. The lease was for a term of five years and expired on February 6, 1969. Near the end of the term of the lease Smith was informed that the building he intended to move to would not be complete until a month or two after the lease with Crechale and Polles expired. Smith attempted to arrange a month to month lease with Crechale and Polles so that he could remain in the building until his new premises were completed. On February 6, Crechale wrote to Smith notifying him that he was to quit and vacate the premises at midnight that day. On March 3rd Crechale accepted a rent check for the month of February. On April 19th Crechale's attorney wrote Smith that Crechale was electing to treat the holdover as a renewal of the lease. Upon those facts we held:
We are of the opinion that once a landlord elects to treat a tenant as a trespasser and refuses to extend the lease on a month to month basis, but fails to pursue his remedy of ejecting the tenant, and accepts monthly checks for rent due, he in effect agrees to an extension of the lease on a month to month basis.
295 So.2d at 278.
In the instant case we see an almost identical factual situation. Howie wrote to Roark on June 5th and demanded that the premises be surrendered at the expiration of the lease. Howie never elected to pursue this remedy by having the Department evicted. Instead, he accepted vouchers dated July 11th for payment of the July rent. Howie's failure to pursue the remedy of eviction created a month to month tenancy when he accepted the state's payment of the July rent.
Having created a month to month tenancy by the acceptance of the July rent Howie was entitled to nothing further. Under the law he could have had the Department *779 evicted and sued for double rent  but he chose not to do this. Therefore, Howie was entitled to no relief whatsoever, having been paid all he was due for the July tenancy.
Of course, because we have held that the lease contract was not renewed and Howie was not entitled to any relief, the chancellor's decision awarding attorneys fees and a late charge to Howie is also reversed. We have thoroughly examined the other assignments of error and find no merit in them.
Therefore, based on all of the foregoing, we hereby reverse and set aside the judgment awarded to Homer Lee Howie and render this cause.
REVERSED AND RENDERED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and HAWKINS, PRATHER, ROBERTSON and SULLIVAN, JJ., concur.
BOWLING, J., not participating.
NOTES
[1] Of course, § 89-7-25 is the exclusive remedy to a landlord only insofar as money damages. The landlord is still free to evict a holdover tenant under § 89-7-27 Miss. Code Ann. (1972).