# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-CA-01413-SCT

## CONSOLIDATED WITH

## NO. 1999-IA-01527-SCT

*CITY OF JACKSON, MISSISSIPPI AND*
*UNIVERSITY OF MISSISSIPPI MEDICAL*
*CENTER*

**v.**

*THE ESTATE OF OTHA STEWART, DECEASED,*
*BY AND THROUGH ITS ADMINISTRATOR,*
*EMMA WOMACK*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/01/2003 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | SHARON DIANE GIPSON |
| | PIETER JOHN TEEUWISSEN |
| | LANNY R. PACE |
| | CORRIE SCHULER |
| ATTORNEYS FOR APPELLEE: | JAMES A. BOBO |
| | MARK C. BAKER, SR. |
| | BERNARD C. JONES, JR. |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART; AND REVERSED AND REMANDED IN PART - 05/12/2005 |
| MOTION FOR REHEARING FILED: | 05/26/2005; DENIED AND OPINION MODIFIED AT ¶ ¶ 38, 39, 40, 43, 48, 49, 51, 55 59, 61, 62 & 63 - 08/04/2005 |
| MANDATE ISSUED: | |

**BEFORE SMITH, C.J., CARLSON AND DICKINSON, JJ.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1. This is a personal injury case in which an elderly lady fell after exiting a van operated by the City of Jackson (the "City"), and before entering a day care center operated by the University of Mississippi Medical Center (the "Hospital"). The case was tried to the bench, and the trial court found both the City and the Hospital liable, and both have appealed.

## FACTUAL BACKGROUND

¶2. Mrs. Otha Stewart suffered a stroke in 1978 which resulted in paralysis to the right side of her body. In 1993, she began attending an adult day care center in the city. To get to and from the day care center, she used a van service operated by the City of Jackson.

*The Hospital contract*

¶3. A few years later, in response to a proposal submitted by the University of Mississippi Medical Center (the "Hospital"), the Central Mississippi Planning and Development District\ Area Agency on Aging ("CMPDD") hired the Hospital to provide certain services within "the district," which is identified in the contract as "the City of Jackson." The operation of the day care center was included in the services to be provided under the contract.

¶4. The contract, which began October 1, 1996, and ended September 30, 1997, had a service objective of 7,500 meals and 15,000 snacks. The contract generally obligated the Hospital: "To provide care, supervision and services to individuals who are capable of only limited self-care; meet health maintenance and rehabilitation need and promote maximum level of independent functioning." More specifically, the contract obligated the Hospital to:

2

(1)     Provide blood pressure checks to participants at least three times a week;

(2)     Do foot care assistance, such as toenail cutting, to participants as needed, but at least twice a month;

(3)     Arrange for eye examinations as needed, and

(4)     Arrange for qualified speakers to provide educational programming on dietary needs, ear care, physical and occupational therapy and any other health-related information to participants.

¶5.     There is no mention of transportation to or from the day care center in the 21-page contract between CMPDD and the Hospital.  However, the Quality Assurance Standards (an attachment to the contract) provided certain minimum program requirements, including service activities, location of service, access to service, delivery characteristics, staffing, prohibited service activities, qualifications, personnel management, and monitoring.  Section D, "Minimum Program Requirements," sub-paragraph 1(d), "Transportation Services," provides the following:

> The day care program shall exert reasonable effort to arrange transportation when needed, for participants to and from their homes and to other community facilities utilized in implementing the participants plan of care.  Handicapped accessible transportation shall be provided.
>
> The center is encouraged to use community transportation systems and/or families for the provision of transportation when available.  All contracted transportation systems shall meet local, state and federal regulations.  It is recommended that participants be transported no more than sixty minutes without the opportunity for a rest stop.

¶6.     It is not clear from the record before us who actually had the responsibility of transporting participants to the day care center on a daily basis when the Hospital's contract

3

began on October 1, 1996.[1]  However, on November 20, 1996, CMPDD contracted with the City of Jackson to provide transportation for participants "to and from community resources for the purpose of obtaining needed services and goals."  This contract had an effective date of October 1, 1996; and therefore, pursuant to the contract, the City began providing a van and driver to pick up participants (including Mrs. Stewart) on October 1, 1996.  The City was not a party to the Hospital's contract with CMPDD, and the Hospital was not a party to the City's contract with CMPDD.

*The incident*

¶7.     For several months after the inception of the two contracts on October 1, 1996, the Hospital operated the day care center, and the City provided a regular driver and van to pick up Mrs. Stewart, who regularly attended.

¶8.     On August 11, 1997, Doris Spiller, an employee of the City, was substituting for the regular van driver.  She picked Mrs. Stewart up at her home and proceeded to the day care center where she helped Mrs. Stewart off the van.  The day care center is located in a business park environment where several businesses share a parking lot which is owned and operated by the owner of the business park.

¶9.     After assisting Mrs. Stewart off the van and "stabilizing" her, Spiller turned to assist another passenger from the van.  Mrs. Stewart took a few steps toward the center and began to fall.  When Spiller saw Mrs. Stewart begin to fall, she reached out for Mrs. Stewart and

---

[1]We are informed in one of the briefs that the City had been transporting participants (including Mrs. Stewart) to the day care center even prior to the contract between CMPDD and the Hospital.

4

attempted unsuccessfully to break the fall. Both Mrs. Stewart and Spiller fell to the ground. Mrs. Stewart hit her head on the pavement.

¶10. Mrs. Stewart was taken to the emergency room where, according to the emergency room doctor, she had no swelling, her blood pressure was normal, and she seemed fine. She was released to go home, and her daughter, Emma Womack, was told to watch her for several days.

¶11. Mrs. Stewart stayed home the next two days, but decided to return to the center on August 14, even though she admitted to Womack that "she was still hurting and her head and legs were still bothering her." While in the bathroom at the day care center the next day, Mrs. Stewart fell again, but the fall was not considered serious. Mrs. Stewart remained at the center for the rest of the day.

¶12. Later that night, Mrs. Stewart was unable to rest well. She complained about her head, and the next morning she regurgitated her breakfast and was disoriented. Womack called an ambulance to take Mrs. Stewart to the emergency room. After she was examined, she was given prescriptions for pain and muscle relaxers, and she was then released to return home.

¶13. Because Mrs. Stewart continued to have problems, Womack took her to see Dr. Calvin Ramsey a few days later. Dr. Ramsey referred her to Dr. Don Gipson, who had Mrs. Stewart admitted to the hospital for further tests. According to Womack, Dr. Gipson told her that Mrs. Stewart had suffered another massive stroke, "far worse than the one she had in the 70's."

*The litigation*

5

¶14.   On August 7, 1998, Mrs. Stewart sued the City, Spiller, and the Hospital for injuries resulting from the fall in the parking lot.  On November 23, 1998, a conservatorship was established for Mrs. Stewart, and her daughter, Emma Womack, was appointed conservator of the person and estate of Mrs. Stewart.  On December 18, 1998, Womack, in her capacity as Mrs. Stewart's conservator, was substituted as the plaintiff.

¶15.   The Hospital, the City, and Spiller filed motions for summary judgment, and on September 1, 1999, the trial court denied the Hospital's motion and granted summary judgment to the City and Spiller.  The Plaintiff filed an interlocutory appeal of the summary judgment granted to the City and Spiller.

¶16.   This Court reversed the summary judgment, holding that the City was obligated under its contract with CMPDD to provide safe delivery of patrons to the day care center, and that Mrs. Stewart was a third-party beneficiary of that contractual obligation.  ***Stewart ex. rel. Womack v. City of Jackson,*** 804 So. 2d 1041 (Miss. 2002).

¶17.   The matter was tried to the bench for three days, beginning September 25, 2002.  Mrs. Stewart died on November 4, 2002, and her estate was substituted as plaintiff on January 30, 2003.  Thereafter, the trial court entered its Memorandum Opinion and Order on March 19, 2003, and Final Judgment was entered on April 1, 2003.  In the findings of fact and conclusions of law included in the Memorandum Opinion and Order, the trial court found that:

(1)    the City was liable for its failure to "train its drivers and to ensure the safety of its passengers;"

(2)    the City should have provided Spiller with special training in assisting and handling elderly passengers;

6

(3)     the Hospital was liable for its failure to have personnel available in the parking lot to assist the passengers of the City's van in walking into the day care center;

(4)     that Mrs. Stewart was a third-party beneficiary of the contract between the City and CMPDD.[2]

¶18.    With respect to the liability of the Hospital, the trial court stated:

> The second question before this Court is whether plaintiff was a third party beneficiary of the City of Jackson-CMPDD contractual agreement and the UMMC-CMPDD contractual agreement. The Supreme Court of Mississippi found that the Plaintiff was indeed a third-party beneficiary of the transportation agreement between the City of Jackson and CMPDD. *Stewart v. City of Jackson*, 804 So. 2d 1041 (Miss. 2002). Because Plaintiff is a third-party beneficiary she is legally entitled to sue for the breach of these contracts. The breach of the UMMC and the City of Jackson contractual agreements were material and were the subsequent cause of Plaintiff's injuries.

¶19.    The trial court awarded Mrs. Stewart's Estate $500,000 on the tort claim, and $500,000 on the breach of contract claim. The trial court then added these two sums together to reach a final verdict for Mrs. Stewart in the amount of $1,000,000. From this judgment, both the Hospital and the City appeal.

## ANALYSIS

¶20.    This Court reviews questions of law, including the proper application of the Mississippi Tort Claims Act, de novo. *Donaldson v. Covington County,* 846 So.2d 219, 222 (Miss. 2003) (citing *City of Jackson v. Perry*, 764 So.2d 373, 376 (Miss. 2000)).

¶21.    The standard of review for the admission or exclusion of testimony is abuse of discretion. The admission of expert testimony is left to the sound discretion of the trial judge.

---

[2]Curiously, the trial court made no finding as to whether Mrs. Stewart was a third-party beneficiary of the contract between the Hospital and CMPDD.

7

Unless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion, that decision will stand. *Crane Co. v. Kitzinger,* 860 So.2d 1196, 1201 (Miss. 2003).

¶22. The four issues we shall address are:

  I.    Whether, at the time of the fall, the Hospital had a legal duty to Mrs. Stewart which it breached, proximately causing her damage.

  II.   Whether Mrs. Stewart can recover damages under both the Mississippi Tort Claims Act and breach of contract, for the same injuries.

  III.  Whether a stroke is a type of damage which is a reasonably foreseeable consequence of the alleged negligence of Mrs. Spiller.

  IV.   Whether plaintiff's expert, Kearney Waites, testified outside the realm of his expertise.

I.

¶23. The two separate contracts with CMPDD are the only known contracts associated with this case. The record reflects no contract between the Hospital and the City regarding the day care center. The Hospital contracted with CMPDD to provide facilities and a program suited for those who would be attending the day care center, while the City contracted to provide transportation and home-delivered meals. We find no reference in the Hospital's contract to any obligation to provide transportation, other than its obligation to "exert reasonable effort[s] to arrange transportation when needed." There is no dispute that CMPDD arranged transportation through its contract with the City. Thus, from the Hospital's standpoint, transportation was not "needed." Once a determination is made that the provision of transportation is not needed, the Hospital's obligation "to arrange transportation" ends.

8

¶24. The Estate makes much of the fact that, on many occasions, personnel from the day care center would come out into the parking lot to meet the van and assist participants into the building. However, the City's employees who drove the van testified that assistance from the day care center personnel was only occasional, and no testimony was offered that such assistance was contracted for or an obligation of the Hospital. It is also clear that, on the day Mrs. Stewart fell, no personnel from the day care center came to the parking lot. Thus, it cannot be argued that the City had turned the care of Mrs. Stewart over to the Hospital.

¶25. This Court has held that "negligence is the result of the failure to perform a duty; therefore actionable negligence cannot exist in the absence of a legal duty to an injured plaintiff." *Stanley v. Morgan & Lindsey, Inc*., 203 So.2d 473, 475 (Miss. 1967). Since no evidence suggests that the Hospital ever assumed a legal duty or obligation regarding the transportation of attendees of the adult day care center program, we must reverse the trial court's finding of liability against the Hospital.

## II.

¶26. Mrs. Stewart claims that the City breached an implied term in its written contract with CMPDD to "provide her with safe delivery to the daycare center, not the parking lot in front of the daycare center." *Stewart ex rel. Womack v. City of Jackson*, 804 So.2d 1041, 1050 (Miss. 2002). She was allowed to pursue this claim because we held she was a third-party beneficiary of the contract between the City and CMPDD. *Id*. at 1051.

*Breach of implied contract*

9

¶27. By enacting Miss. Code Ann. §§ 11-46-1 et seq., the Legislature defined the parameters for sovereign immunity within this state. This group of statutes is commonly known as the "Mississippi Tort Claims Act" and has been amended on numerous occasions since its original enactment in 1984.

¶28. Miss. Code Ann. § 11-46-3, which grants sovereign immunity, stated at the time of Mrs. Stewart's injuries:

> The Legislature of the State of Mississippi finds and determines as a matter of public policy and does hereby declare, provide, enact and reenact that the "state" and its "political subdivisions," as such terms are defined in Section 11-46-1, are not now, have never been and shall not be liable, and are, always have been and shall continue to be immune from suit at law or in equity on account of any wrongful or tortious act or omission or **breach of implied term or condition of any warranty or contract.**

Miss. Code Ann. § 11-46-3(1)(1997).

¶29. The phrase "breach of implied term or condition of any warranty or contract" was added in the Legislature's Special Session of 1992. This Court's first opportunity to interpret the statute, as amended in 1992, was *Quinn v. Mississippi State University*, 720 So.2d 843 (Miss. 1998), which held that, by paying an admission fee to a baseball camp at Mississippi State University, Brandon Quinn's parents "entered into an implied contract with the university. This contract carried with it the implied promise that the university would provide a safe instructional environment for [Brandon Quinn]." *Id*. at 850. Thus, the Quinns were allowed to pursue their breach of contract claim against the university.

¶30. In reaching its conclusion, the *Quinn* majority provided no analysis of the 1992 addition of "breach of implied term or condition of any warranty or contract" to the sovereign

10

immunity statute. Instead, it concentrated on an analysis of the validity of a release signed by the Quinns. *Id*. However, Justice Mills pointed out in his separate opinion the fallacy of the majority's reasoning by stating, "The same sovereign immunity that bars the Quinns' tort claim against MSU bars their breach of implied contract claim as well." *Id*. at 856 (Mills, J., concurring in part & dissenting in part). As authority for his statement, Justice Mills cited the language added by the 1992 amendment to the sovereign immunity statute.

¶31. The *Quinn* majority concluded that sovereign immunity did not apply to breach of implied contracts by applying the holding of three prior cases; *Churchill v. Pearl River Basin Development District*, 619 So.2d 900 (Miss. 1993), *Mississippi State Dep't of Welfare v. Howie*, 449 So.2d 772 (Miss. 1984), and *Cig Contractors, Inc. v. Mississippi State Bldg. Comm'n*, 399 So.2d 1352 (Miss. 1981). Reliance on these three cases was misplaced.

¶32. The cause of action in the latter two cases, *Howie* and *Cig Contractors*, arose prior to the Legislature's enactment of the Mississippi Tort Claims Act, and long before the "implied contract" amendment in 1992. While the decision in *Churchill* relied upon the Tort Claims Act, the cause of action in that case arose prior to the effective date of the "breach of implied term or condition of any warranty or contract" language.

¶33. Prior to *Quinn*, this Court has not addressed the "implied contract" language in the 1992 amendment. However, the Court of Appeals addressed the language in *City of Grenada v. Whitten Aviation, Inc.* 755 So.2d 1208 (Miss. Ct. App. 1999), in which the court held:

> The City, in attempting to apply MTCA to the facts in the case at bar, has taken the phrase "breach of implied term or condition of any warranty or contract" out of context. The clear intent of the legislature in enacting MTCA was to immunize the state and its political subdivisions from any *tortious*

11

conduct, including *tortious* breach of implied term or condition of any warranty or contract. The provisions of MTCA have no application to a pure breach of contract action as is the subject of the case at bar.

*Id.* at 1213. Making the same error as the ***Quinn*** majority, the Court of Appeals cited ***Churchill*** as its authority. ***Id.***

¶34. We erroneously adopted the Court of Appeals' interpretation in ***Harrison County Development Comm'n v. Daniels Real Estate***, ***Inc.,*** 880 So.2d 272 (Miss. 2004), again using as authority the same three inapposite cases cited in ***Quinn***.

¶35. We are required to give effect to the language selected by the Legislature to be included in the 1992 amendment to the sovereign immunity statute. In the context of the case before us, there are two possible interpretations of the language, *"immune from suit at law or in equity on account of any wrongful or tortious act or omission or breach of implied term or condition of any warranty or contract."* One interpretation is that the Legislature granted sovereign immunity for a "wrongful or tortious act or omission," and additionally for a "breach of implied term or condition of any warranty or contract." The other interpretation provides that the term, "wrongful or tortious" modifies not only "act or omission," but also modifies "breach of implied term or condition of any warranty or contract." Stated another way, the statute either (1) grants sovereign immunity for a "wrongful or tortious act or omission" **and also** grants sovereign immunity for "breach of implied term or condition of any warranty or contract," or (2) grants sovereign immunity for wrongful or tortious acts, and for wrongful or tortious omissions, and for wrongful or tortious breach of implied contract. Acceptance of the latter interpretation would require us to accept that, by specifically

12

including a tortious breach of *implied* contract, the language of the statute intended to exclude tortious breach of *express* contract. Otherwise, there would have been no purpose in including the word, "implied."

¶36. The former interpretation, on the other hand, is in complete harmony with the text of the statute. Furthermore, by granting sovereign immunity for claims of breach of implied contract, the statute does no violence to the reasoning in prior decisions which refused to allow the state and its political subdivisions to invoke sovereign immunity to escape its written contractual obligations.

¶37. The Legislature added the phrase "breach of an implied term or condition of any warranty or contract" as a separate dependent clause after the dependent clause "on account of any wrongful or tortious act or omission." The adjective "tortious" obviously modifies act or omission. However, there is nothing in the language of the statute to indicate that it also modifies the separate dependent clause. That is to say, there is nothing in the language of the statute to lead us to conclude that a "breach of an implied term or condition of any warranty or contract" must be tortious.

¶38. We therefore hold that Miss. Code Ann. § 11-46-3 grants immunity to the state and its political subdivisions for "breach of implied term or condition of any warranty or contract." However, Miss. Code Ann. § 11-46-5 provided a limited waiver of the immunity granted under Section 11-46-3, and it further provides that Miss. Code Ann. § 11-46-15 shall set "the extent of the maximum amount of liability." In this case, the maximum liability under § 11-46-15 at the time of the incident, was $250,000.

¶39. Although we previously held in ruling on an interlocutory appeal in this case, that Mrs. Stewart was a third-party beneficiary of the City's contract with CMPDD, we did not address the issue of damages, or whether the City's liability was limited. The City enjoys immunity for claims that it breached an implied contractual term. That immunity, however, is waived by Section 11-46-5, to the extent of the $250,000 maximum damages allowed by Section 11-46-15. Thus, the maximum recovery allowed by the statute under Mrs. Stewart's breach of contract claim is $250,000. To the extent *Quinn* and *Harrison County Development Comm'n* conflict with our holding today, they are overruled. Today's holding gives full meaning and effect to each phrase of the amended statute.

¶40. The Estate's breach of contract action and its tort action both arise from the same set of operative facts, and they allege the same damage. In other words, plaintiff claims when Mrs. Spiller left Mrs. Stewart unattended, the City breached its contract with CMPDD and it was also negligent. Plaintiff further claims it was permissible for her to bring suit under both causes of action. We agree. However, this Court has never held that a plaintiff may pursue two causes of action or theories and, having established liability under both, collect the same damages under both.

¶41. This Court recently held "that '[t]here can be but one satisfaction of the amount due the plaintiff for his damages'. . . Thus, double recovery for the same harm is not permissible." *Medlin v. Hazlehurst Emergency Physicians,* 889 So.2d 496, 500-01 (Miss. 2004).

¶42. The trial court correctly held that the maximum recovery against the City for Mrs. Stewart's tort claim was $250,000. Her maximum recovery under her claim for breach of

implied contract is also the same $250,000. However, these are the same damages awarded under two separate theories of recovery. As such, Mrs. Stewart's estate is entitled to only one recovery. Thus, she may recover no more than $250,000, whether for negligence, breach of contract, or both.[3]

III.

¶43.   We now turn to the proof of damages. The Estate claims that Mrs. Stewart's fall on August 11, 1997,  resulted in a stroke, and much evidence was admitted to establish an amount of compensation for the stroke. In order to recover damages related to the stroke, however, the Estate must show more than negligent conduct which resulted in damages; it must show not only that the stroke resulted from the fall and that the fall resulted from a defendant's negligence, but also that a stroke is a reasonably foreseeable consequence of the alleged negligent act. That is, the estate must show that where one negligently allows a person like Mrs. Stewart to fall, stroke is a type of damage that is reasonably probable to occur.

¶44.   Mississippi case law is replete with foreseeability cases. Two such cases are **Donald v. Amoco Production Co.**, 735 So.2d 161 (Miss. 1999),  and **Gulf Refining Co. v. Williams** 183 Miss. 723, 185 So. 234 (1938). Another case decided by a United States District Court is  **Smith v. United States**, 284 F. Supp. 259 (S.D. Miss. 1967), *aff'd per curiam,* 394 F.2d 482 (5th Cir. 1968).

---

[3]Because of the result we reach today, we need not analyze the Estate's claim of traditional tort damages under a breach of contract theory. We do not hold such recovery is impossible but caution that careful analysis is required. See **Hadley v. Baxendale**, 9 Exch. 341, 156 Eng. Rep. 145 (1854).

¶45. In ***Smith***, the district court held:

> It is the universal rule in tort actions that *mere proof of injury complained of raises no presumption of negligence...* 'Foreseeability, as respects liability of the negligent person, does not include events which are bizzare or so unique as to be without the...contemplation of one reasonably prudent'... 'A person charged with negligence in that he should have anticipated the probability of injury from an act done by him is not bound to a prevision or anticipation which would include an unusual, improbable or extraordinary occurrence, *although such happening is within range of possibilities*.'

284 F. Supp. at 261-62 (citations omitted & emphasis added).

¶46. In ***Donald***, this Court held "[a] defendant is *obligated solely to safeguard against reasonable probabilities* and is not charged with foreseeing all occurrences, even though such occurrences are within the range of possibility." 735 So.2d at 175 (citations omitted & emphasis added).

¶47. In ***Williams***, this Court held:

> The general language of the courts in stating the rule of law of negligence in regard to the liability of the actor as to harmful results which are foreseeable is that he will be liable for all such harm as a reasonably prudent person would or should have anticipated as the natural and probable consequences of his act.
>
> * * *
>
> 'Probability arises in the law of negligence when viewed from the standpoint of the judgment of a reasonably prudent man, as a *reasonable thing to be expected*'
>
> * * *
>
> It is true, as already mentioned, that remote possibilities are not within the rules of negligence as respects foreseeability . . . these rules do not demand 'that a person should prevision or anticipate an unusual, improbable, or extraordinary occurrence, though such happening is within the range of possibilities...*Remote possibilities do not constitute negligence from the judicial standpoint*.'

185 So. at 235-36 (citations omitted & emphasis added).

16

¶48. We wish to emphasize that the question of foreseeability is different from the question of causation. The causation question is whether the City's negligence caused or substantially contributed to Mrs. Stewart's stroke. This is a question which can be answered only by examining the facts of this particular incident after the fact. We find the Estate produced sufficient evidence to establish causation.

¶49. By contrast, foreseeability presents the question of whether a stroke is the type of damage which reasonably should be *anticipated* (or foreseen before the fact) as a result of negligently allowing an elderly person to fall in a parking lot. This is the precise teaching from **Donald**, **Williams,** and **Smith**.

*Dr. Calvin Ramsey*

¶50. Two physicians testified concerning the stroke. The first physician was Mrs. Stewart's family physician, Dr. Calvin Ramsey, who had treated her for numerous ailments since 1985. Dr. Ramsey saw Mrs. Stewart eight days following the fall in the parking lot at the day care center. During that eight-day period, Mrs. Stewart had another fall in the rest room at the day care center.

¶51. Dr. Ramsey, board certified in internal medicine, described Mrs. Stewart as "a darling patient" who he had been taking care of for "some 20 years or so." He testified that Mrs. Stewart suffered a stroke in 1977 and had experienced numerous medical problems. He further testified that, in his opinion, Mrs. Stewart suffered an extension of the 1977 stroke following the fall at the day care center on August 11, 1997.[4] When asked when the stroke

---

[4]Although this testimony was sufficient for the question of causation, it had no bearing on the question of foreseeability.

17

occurred, Dr. Ramsey testified, "And all I can tell you is that sometime between the 11th and the 19th, she had the stroke." Dr. Ramsey later admitted that it was possible that she had a stroke on the 11th and then fell. When asked, "How do you know that she didn't have a stroke on the 11th, and that caused her to fall?" He replied, "Well, Counsel, I don't think we're disagreeing about that. She could have had a stroke on the 11th, and I don't know that." He further testified that Mrs. Stewart's stroke could have been caused by the fall or it could have been caused by stress.

¶52. Dr Ramsey acknowledged that medical records from Mrs. Stewart's visit to St. Dominic's emergency room on the 11th established that her blood pressure was normal. Although referencing an MRI from August 19, 1997, Dr. Ramsey admitted he never personally reviewed the scan. In reference to Mrs. Stewart's numerous hospital admissions for various treatments since August 1997, he testified that the stroke caused her pneumonia, urinary tract infections, and "every single hospitalization."

¶53. Dr. Ramsey summed up his opinion in the following statement:

The issue is that she fell and struck her head, it caused a lump, contusions, ended up with a stroke, which changed her whole life. And generalized ability and all the other things that we have talked about, all attest to the fact that she should have been handled with a little bit more care when she was getting off that bus. Louise wasn't there to help her off the bus that day; there was a substitute there. And it's unfortunate that that happened, but if Louise or someone was paying more attention to Ms. Stewart, then she would not have fallen. That's the issue.

¶54. In discussing Mrs. Stewart's condition prior to her fall on August 11, 1997, Dr. Ramsey was asked whether she required assistance to walk. He testified, "No sir. She was using a quad cane and . . . [her daughter] would help her in getting up to the exam table, but as she

18

ambulated down the hall, she was able to walk on her own with no assistance. . . . She would need assistance in getting from Point A to Point B, but once she was up on her feet, she was able to walk without any assistance." He later confirmed that Mrs. Stewart could walk on her own, "but if she has to go up an incline, down an incline, getting from a seated position, getting from a whatever position, to get up to stand to walk, she certainly needs assistance."

¶55. Although Dr. Ramsey offered a great deal of testimony concerning whether the fall on the 11th caused the stroke,[5] and whether the stroke caused Mrs. Stewart's numerous maladies, he offered no testimony which sheds light on the question of whether stroke was a foreseeable risk or expected consequence of the fall.

### Dr. Clara Adele Thiel

¶56. The second physician to testify at trial was Dr. Clara Adele Thiel, a board certified neurologist with an office at River Oaks Hospital in Jackson. Dr. Thiel never treated Mrs. Stewart but formulated her opinions upon review of the medical records.

¶57. Dr. Thiel testified that the standard of care when a physician suspects a stroke is to order an MRI or CT scan. She noted that neither was ordered when Mrs. Stewart visited the emergency room following the fall on August 11th. She further testified that St. Dominic's Hospital records reflected no swelling, no increased blood pressure, and no neurological deficit on the day of the fall.

¶58. Dr. Thiel testified that the symptoms exhibited by Mrs. Stewart as reported in the hospital admission on the 19th could indicate a new stroke, but they could also be caused by

---

[5]See footnote 4, and accompanying text, supra.

any number of minor things, and an MRI is required to diagnose a new stroke, an extension of the old stroke, or one of the other more minor causes of the symptoms. The MRI, performed on Mrs. Stewart on the 19th, showed the old stroke but no evidence of a new stroke. Dr. Thiel testified that "essentially, she had old chronic findings but nothing new." Dr. Thiel testified she would expect something to show up on an MRI to indicate a new stroke, even just a mild one.

¶59. Concerning the foreseeability[6] of a stroke resulting from the fall, Dr. Thiel testified:

> It would be extremely uncommon, almost unheard of for a minor fall to cause a stroke. . . . any minor head trauma should not cause a stroke. . . . I am saying that head trauma per se is not really cause for strokes. It's not a precipitating factor for stroke, you know. If you have a major head trauma, certainly there can be some sequelae and some problems form [sic] that, but it's generally not a stroke.

¶60. As stated earlier in *Smith v. United States*, "A person charged with negligence in that he should have anticipated the probability of an injury from an act done by him is not bound to a prevision or anticipation which would include an unusual, improbable or extraordinary occurrence, although such happening is within range of possibilities. 284 F. Supp. at 261-62. The only expert witness to testify concerning the likelihood of a fall causing a stroke was Dr. Thiel, who testified that it is "extremely uncommon, almost unheard of for a minor fall to cause a stroke. . . . I am saying that head trauma per se is not really a cause for strokes."

¶61. The Estate directs us to much authority which establishes that a particular injury need not be anticipated, so long as some injury can reasonably be expected to result from negligent

---

[6]Counsel for the Estate argue that Dr. Thiel never used the word, "foreseeable." Her testimony, however, under any label, clearly characterized stroke as an unforseen consequence of Mrs. Stewart's fall and head trauma.

conduct. *See e.g., **Gulledge v. Shaw***, 880 So. 2d 288, 293 (Miss. 2004). We do not retreat from this principle of law. It should certainly be anticipated that negligently allowing an elderly person to fall in a parking lot could lead to many kinds of injuries including a broken arm, cuts bruises, or even concussion. The exact injury need not be expected, anticipated or even contemplated. But these are *injuries* brought about by trauma. A stroke is not an injury but rather a medical condition which (according to Dr. Thiel's unrebutted testimony) is not an anticipated result of trauma. Thus, our holding in *Gulledge* is inapposite.

¶62.     Citing **Blake v. Clein**, 903 So. 2d 710, 729-30 (Miss. 2005), the Estate also urges us to find that Mrs. Stewart was an "eggshell plaintiff." The "eggshell plaintiff" theory does not obviate the necessity to show foreseeability. It simply provides that plaintiffs who are far more susceptible to a particular harm than the average person may nonetheless recover their full damages without reduction. In other words, you take the plaintiff as you find him or her. Applying the "eggshell plaintiff" theory to this case, if stroke were a foreseeable consequence of the City's negligence, then the City would be liable for all damages related to the stroke, even if Mrs. Stewart were far more susceptible to stroke than the average person. But we do not reach the "eggshell plaintiff" analysis without first satisfying the question of foreseeability.

¶63.     Because the unchallenged[7] expert testimony at trial established that stroke is not a foreseeable consequence of the alleged negligence which led to Mrs. Stewart's fall, we hold

---

[7]The Estate claims Dr. Thiel's testimony was "directly contrary to the opinions of three (3) well qualified treating physicians." The record belies this claim. There is no contradiction in the record to Dr. Thiel's testimony that "head trauma per se is not really a cause for strokes."

that the Estate may not recover damages related to the stroke, whether or not it was caused by the fall on August 11, 1997.

IV.

¶64. Mrs. Stewart called Kearney Waites to testify as an expert and tendered him as an expert in administrating programs with a component of transporting the elderly and infirm. At the time of trial, Waites was the director of the Association for Retarded Citizens Programs in Warren County. He received both a master's degree in counseling and a bachelor of arts degree in education from the University of Mississippi. None of his programs dealt specifically with the transportation of elderly citizens. Mrs. Stewart's attorney admitted that "[w]e're not offering him as an expert in contract law." Even after this admission, however, the trial court allowed Waites to testify about numerous contracts, policies, regulations and forms including specific contract provisions, how they interacted, what standard of care they provided and who was bound by them.

¶65. Since the standard of review for the admission of expert testimony is abuse of discretion, the decision will be reversed only if there is a finding that the discretion was arbitrary and clearly erroneous. *Crane Co. v. Kitzinger,* 860 So.2d at 1201. We find that matters of contract interpretation were clearly outside the tendered expertise of Mr. Waites. In *Hart v. State*, 637 So.2d 1329, 1338 (Miss. 1994), this Court held "[a] trial judge may exclude expert opinions which are not helpful to the trier of fact and which state legal conclusions beyond the specialized knowledge of the expert." The realm of expert testimony was further clarified when this Court held that an expert may not "offer so-called expert

22

testimony in other areas in which he not even remotely meets the Miss. R. Evid. 702 criteria."

***Stubbs v. State,*** 845 So.2d 656, 670 (Miss. 2003).

¶66. In light of ***Hart*** and ***Stubbs,*** the trial court abused its discretion by allowing Waites to testify to integral contract matters without any expertise in contract interpretation.

## CONCLUSION

¶67. We affirm the trial court's judgment to the extent that it found the City liable to Stewart. We reverse the trial court's judgment against the University of Mississippi Medical Center, and we render judgment here that Stewart take nothing from it and that Stewart's complaint and action against it are finally dismissed with prejudice. We reverse the trial court's judgment awarding $500,000 against the City of Jackson, and we remand this case for a new trial on damages consistent with this opinion, with instructions to the trial court to limit any damage award against the City to $250,000, and to exclude from its award any damages attributable to the stroke.

¶68. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART; AND REVERSED AND REMANDED IN PART.**

**SMITH, C.J., WALLER AND COBB, P.JJ., AND CARLSON, J., CONCUR. RANDOLPH, J., CONCURS IN RESULT ONLY. EASLEY, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. DIAZ AND GRAVES, JJ., NOT PARTICIPATING.**

23