# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-CA-01997-SCT

*THE CITY OF JACKSON, MISSISSIPPI*

*v.*

*THE ESTATE OF OTHA STEWART, DECEASED,*
*BY AND THROUGH ITS ADMINISTRATOR,*
*EMMA WOMACK*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/20/2008 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | PIETER JOHN TEEUWISSEN |
| | CLAIRE BARKER HAWKINS |
| ATTORNEYS FOR APPELLEE: | JAMES A. BOBO |
| | MARK C. BAKER, SR. |
| | BERNARD C. JONES, JR. |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED -10/14/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., LAMAR AND PIERCE, JJ.**

**PIERCE, JUSTICE, FOR THE COURT:**

¶1.     In 2002, the Circuit Court of Hinds County in a bench trial found the City of Jackson

liable for a fall sustained by an elderly woman, which the plaintiff alleged caused a stroke.

Finding that a stroke was not foreseeable, we remanded the case for a new trial on damages.

The trial court awarded the maximum amount of damages under the Mississippi Tort Claims

Act, $250,000, after hearing testimony from Dr. Stephen Hayne, expert for the plaintiff, that

the fall had caused a "traumatic brain injury" and not a stroke. Because of our great deference to trial courts, we affirm.

## STATEMENT OF THE CASE[1]

¶2.     Otha Stewart, left disabled by a stroke in 1978, attended an adult day care center at the University of Mississippi Medical Center (UMMC) from 1993 to 1997. The City of Jackson provided transportation for the infirm, like Stewart, to and from UMMC. On August 11, 1997, Stewart fell after taking a few steps toward the center. Doris Spiller, who drove the City's transport van, attempted unsuccessfully to break Stewart's fall. Stewart hit her head on the pavement and was taken to the emergency room, where, according to the emergency room doctor, she had no swelling, her blood pressure was normal, and she seemed fine. She was released, but her daughter, Emma Womack, was told to watch her for several days.

¶3.     The next two days, she stayed at home, but returned to the center on August 14 even though she had told her daughter, Womack, that "she was still hurting and her head and legs were still bothering her." She fell in the bathroom that day at the center, but the fall was not considered serious. She did not sleep well that night, and the next morning she regurgitated her breakfast. Womack, her daughter, took her to the emergency room, where the staff examined her, gave her prescriptions for pain and muscle relaxers, and released her.

---

[1]Except where otherwise cited, these facts are taken from our prior opinion in this case, *City of Jackson v. Stewart ex rel. Womack*, 908 So. 2d 703 (Miss. 2005).

¶4. Because Stewart continued to have problems, Womack took her to Dr. Calvin Ramsey and Dr. Don Gipson, who believed Stewart had suffered another massive stroke "far worse than the one she had in the 70's."

¶5. Stewart sued the City and UMMC in August of 1998 on breach-of-contract and tort liability theories.[2] Dr. Ramsey testified at trial that he believed this stroke had happened between Stewart's August 11, 1997, fall and her August 19 visit with him. The daughter testified that, prior to the fall Mrs. Stewart could walk with a quad cane and had limited speech. According to Womack, she became "practically a total invalid" after the fall – unable to eat, walk, stand, or communicate. Dr. Ramsey noted other problems – she had difficulty swallowing which may have caused her bouts with pneumonia, immobility that caused bedsores, and urinary tract infection – which motivated many hospitalizations and were caused, according to Dr. Ramsey, by a second stroke. Plaintiff's counsel's opening statement sums up its theory nicely: " . . . [A]s a result of this fall and the resulting extension of the stroke, Ms. Stewart [was] totally incapacitated."

¶6. The trial court awarded Stewart's Estate $500,000 on the tort claim (split equally between UMMC and the City) and $500,000 on the breach-of-contract claim. UMMC and the City appealed. We reversed and rendered judgment for the hospital, reasoning that they had breached no duty owed to Stewart.[3] Further, we held that awarding damages on tort and contract theories of liability amounted to double recovery, and so we limited damages to the

---

[2]A conservatorship was established for Mrs. Stewart with Womack being named conservator. When Mrs. Stewart died during the litigation, Womack was substituted as plaintiff.

[3]*Stewart ex rel. Womack*, 908 So. 2d at 709.

3

statutory maximum, $250,000.[4][5] Finally, we held that "[because] stroke is not a foreseeable consequence of the alleged negligence which led to Mrs. Stewart's fall . . . the Estate may not recover damages related to the stroke, whether or not it was caused by the fall on August 11, 1997."[6] We remanded for a new trial on damages with instructions to "limit any damage award against the City to $250,000, and to exclude from its award any damages attributable to the stroke."[7]

¶7.    At the new trial on damages, Dr. Steven Hayne testified for the plaintiffs that the fall "injured [Stewart's] central nervous system . . . consistent with the diffuse axonal injury." Further, he testified that "Ms. Stewart ultimately entered a downhill course over time. . . . [H]er diminished mental capacity, diminished ability to avoid aspiration,[8] [and] her diminished physical condition ultimately caused the demise of this patient." Finally, he testified that none of the injuries described were causally related to any stroke suffered by Mrs. Stewart. Both sides stipulated to the introduction of the first trial transcript, but the City offered no new testimony or evidence.

---

[4]*Id.* at 711-12.

[5]Miss. Code Ann. § 11-46-15(1)(b) (Rev. 2002).

[6]*Id.* at 715.

[7]*Id.* at 716.

[8] Defined as:  1. the act of inhaling; 2. The removal of fluids or gases from a cavity by the application of suction. *Dorland's Illustrated Medical Dictionary 152* (25th Ed. 1974). We think, in context, he means that Mrs. Stewart was unable to avoid inhaling bits of food or drops of liquid, leading to pneumonia.

## ANALYSIS

*A. Did the trial court's judgment violate the doctrine of the law of the case?*

¶8.     The question presented by the City is somewhat unwieldy: "Whether the lower court erred in failing to limit damages to those from the fall on the curb." The City argues that this award violates the doctrine of the law of the case: Whatever is once established as the controlling legal rule of decision, between the same parties in the same case, continues to be the law of the case, so long as there is a similarity of facts.[9] And the judgment of the trial court was, at least rhetorically, limited to damages caused by the fall. The opinion order said:

> [Dr. Hayne] testified that . . . it was his opinion . . . that the condition and treatment reflected by the medical records of Mrs. Stewart[] were causally related to the plaintiff hitting her head on pavement when she fell on August 11, 1997. He also testified that the plaintiff's striking her head injured her brain and led to the continuous decline of her cognitive and physical abilities until her death on November 4, 2002. . . . The Court finds Dr. Hayne's testimony credible on the issue of liability and damages.

Our instructions were merely that because any stroke was not a foreseeable result of the fall, injuries resulting from that stroke ought not be considered in calculating damages.[10]

¶9.     The plaintiffs failed under their old logic (a fall caused a stroke which caused various other maladies) because the stroke was not foreseeable. They have crafted a new logic: a fall caused a traumatic brain injury which caused various other maladies. Our prior decision certainly did not suggest that traumatic brain injuries are unforeseeable results of head injuries, so their new theory does not violate any law of the case. Essentially, the City asks whether the trial judge ought to have given credence to a new theory about whether their

---

[9] *Fortune v. Lee County Bd. of Supervisors*, 725 So. 2d 747, 751 (Miss. 1998).

[10] *Stewart ex rel. Womack*, 908 So. 2d at 716.

negligence caused much of Mrs. Stewart's sickness and suffering in her final years. We interpret this as a challenge to the overwhelming weight of the evidence.

*B. Was the trial court's judgment against the overwhelming weight of the evidence?*

¶10.    The findings of fact by a circuit court judge, sitting without a jury, will not be reversed on appeal where they are supported by substantial, credible, and reasonable evidence.[11] The sole evidence offered at the new trial on damages – the testimony of Dr. Steven Hayne – is unavoidably contradictory to expert testimony offered by the plaintiff at the first trial. On the other hand, Womack's undisputed testimony from the first trial is that her mother's fall immediately precipitated her deteriorating health, pain and suffering, and extensive medical bills. In total, the trial court's determinations are not so manifestly wrong that we can disturb them.

¶11.    The inconsistencies in the evidence are troubling. In the original trial, the Plaintiff presented extensive evidence that Stewart's fall had caused an extension of her 1978 stroke. Dr. Calvin Ramsey testified that Stewart's "constellation of symptoms [after August 11, 1997] could have only been caused by a stroke." Dr. Hayne, of course, testified that, based upon his education, training, experience, and activities in the case, the cause of these ailments "was not an exacerbation or extension of a stroke." He testified that the fall produced "severe" brain injuries that were not uncommon in elderly people experiencing similar blows, resulting in mental and physical deterioration ending in death.

---

[11]***Phillips v. Miss. Dep't of Public Safety***, 978 So. 2d 656, 660 (Miss. 2008).

¶12. We think both doctors for the plaintiff used the "differential diagnosis" methodology,[12] though Dr. Ramsey's methodology was not very clearly articulated. Differential diagnosis is a process whereby medical doctors determine which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of clinical findings.[13] By definition and by Dr. Hayne's admission, the plaintiff's experts ruled out the credibility and accuracy of each other's diagnoses.

¶13. But this inconsistency does not disqualify Dr. Hayne's opinion. We have said "[w]here there is conflicting evidence, this Court must give great deference to the trial judge's findings."[14] The inconsistencies between these experts testimony about why Stewart took such a drastic downturn so soon after the fall does not alter the uncontested fact that she did.

¶14. Womack testified that her mother was nonresponsive and unable to stand just five days after the fall, and that she became practically an invalid, taking no pleasure in life. The record is very clear that, though Stewart was disabled before the fall, her difficulties were exacerbated in the near term following her fall. And based upon the medical records entered into evidence, the trial court found that Stewart's medical care cost more than $400,000 in those final years. Dr. Hayne offered an opinion which causally linked Stewart's deterioration and rising medical costs to the negligent act of the City. The trial court found that opinion

---

[12] Dr. Hayne called his methodology "[c]linical by exclusion." Dr. Ramsey listed deteriorating physical symptoms associated with stroke and relied upon an August 19, 1997, hospital discharge report.

[13] *Stedman's Medical Dictionary* 492 (27th Ed.)

[14] ***City of Jackson v. Spann***, 4 So. 3d 1029, 1042 (Miss. 2009).

7

credible. For us to decide otherwise would be to say that the trial court was unmistakably, clearly, plainly, or indisputably wrong.[15] We would have to replace the trial court's judgment with ours.

¶15. In sum, the trial court was faced with the reality that in the near term after a fall that sent her to the hospital, Stewart began to decline in physical and mental health. It found credibility in the opinion of an expert operating under a well-established methodology that the fall and the deteriorating health were causally related. The City offered no new evidence to rebut that opinion testimony. And the trial court found for the plaintiff within its discretion. We will not disturb that finding.

¶16. **AFFIRMED.**

**WALLER, C.J., CARLSON, P.J., DICKINSON, RANDOLPH, LAMAR, KITCHENS AND CHANDLER, JJ., CONCUR. GRAVES, P.J., NOT PARTICIPATING.**

---

[15]*Singley v. Singley*, 846 So. 2d 1004, 1007 (Miss. 2002).