# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-CA-01050-COA

**ERNEST T. JONES**                                                              **APPELLANT**

**v.**

**MISSISSIPPI INSTITUTIONS OF HIGHER**                             **APPELLEES**
**LEARNING, ALCORN STATE UNIVERSITY,**
**DARREN J. HAMILTON, PH.D.,**
**INDIVIDUALLY AND IN HIS OFFICIAL**
**CAPACITY, AND GEORGE E. ROSS, PH.D.,**
**INDIVIDUALLY AND IN HIS OFFICIAL**
**CAPACITY**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/11/2016 |
| TRIAL JUDGE: | HON. LAMAR PICKARD |
| COURT FROM WHICH APPEALED: | CLAIBORNE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JIM D. WAIDE III |
| | WAYNE E. FERRELL JR. |
| ATTORNEYS FOR APPELLEES: | ALAN M. PURDIE |
| | CHRISTOPHER H. CORKERN |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | REVERSED AND REMANDED - 08/14/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., CARLTON AND WILSON, JJ.**

**WILSON, J., FOR THE COURT:**

¶1.    In December 2008, Alcorn State University's head football coach, Ernest Jones, sued the university. He alleged that Alcorn had breached his contract and the implied covenant of good faith and fair dealing in a number of ways, including by firing seven of his assistant coaches and by failing to provide necessary equipment for his team. Jones's complaint also sought an injunction to prevent Alcorn from firing him. The following month, Alcorn fired

Jones. For the next seven years, litigation continued in three different cases until Jones's original lawsuit finally proceeded to a jury trial. The jury found that Alcorn breached its implied covenant of good faith and fair dealing and awarded Jones damages of $500,000. However, the circuit court granted Alcorn's post-trial motion for judgment notwithstanding the verdict (JNOV). Jones then appealed.

¶2. On appeal, Jones argues that the circuit court erred by granting Alcorn's motion for JNOV. Jones also argues that the circuit court erred by denying his pretrial motion to amend his complaint, which prevented him from pursuing a claim that Alcorn breached his contract by firing him without cause. Finally, Jones argues that the circuit court erred by dismissing his claim against Alcorn's former athletic director for tortious interference with contract on the ground that the claim was barred by the Mississippi Tort Claims Act (MTCA).

¶3. We reverse and remand. First, we hold that Jones has a viable claim for breach of the implied covenant of good faith and fair dealing. However, that claim is subject to the MTCA. Because Jones did not satisfy the MTCA's pre-suit notice requirement, the claim must be dismissed without prejudice. Jones may refile the claim, but it must be decided by the circuit judge "without a jury," as required by the MTCA. Miss. Code Ann. § 11-46-13(1) (Rev. 2012). Second, we hold that Jones should have been allowed to pursue a claim that Alcorn breached his contract by firing him without cause. Third, we reverse the dismissal of Jones's claim against Hamilton based on our Supreme Court's recent decision in *Springer v. Ausbern Construction Co.*, 231 So. 3d 980, 988-89 (¶¶32-35) (Miss. 2017), which held that the MTCA does not apply to such a claim.

2

**FACTS AND PROCEDURAL HISTORY**

¶4.     Jones played wide receiver for Alcorn in the mid-1990s and graduated from the university in 1995. After graduation, he briefly played arena and semi-pro football before going into coaching. Jones eventually became an assistant coach at Central Michigan University under head coach Brian Kelly. When Kelly became the head coach at the University of Cincinnati, Jones joined his staff at Cincinnati as the running backs coach. Jones's salary at Cincinnati was $190,000. In 2007, the NCAA recognized Jones as one of ten up-and-coming minority assistant coaches with the potential to become Division I head coaches. Other coaches who received this recognition later became head coaches at the University of Texas, Texas A&M, Penn State, Vanderbilt, and Stanford.

¶5.     In 2007, Jones was hired as Alcorn's head coach with an annual salary of $140,000. Jones was willing to take a significant pay cut because of the opportunity to return to his alma mater as a head coach. The contract that Jones eventually signed was short on details. It consisted of a single page with five additional, standard form clauses attached. The contract was for a term of four years with an annual salary of $140,000. The contract provided that Jones could be fired only for (a) "[f]inancial exigencies as declared by the Board [of Trustees of the State Institutions of Higher Learning (IHL)]"; (b) "[t]ermination or reduction of programs . . . as approved by the Board"; (c) "[m]alfeasance, inefficiency or contumacious conduct"; or (d) "[f]or cause."

¶6.     Darren Hamilton became Alcorn's athletic director in April 2008. Hamilton clashed with Jones almost immediately. Alcorn's then-president, George Ross, testified that the "two

3

men didn't like each other," although Ross said he did not know why. On May 12, 2008, only six weeks after Hamilton arrived at Alcorn, Hamilton wrote a strongly worded "Letter of Reprimand" to Jones, with copies to Jones's personnel file and Alcorn's director of human resources. Hamilton alleged that Jones had violated the university's code of conduct by "inexcusable neglect of duty or insubordination." Specifically, Hamilton alleged that Jones and an assistant coach, Keith Majors, failed to attend a scheduled meeting with him. Jones denied the allegation in a written response. According to Jones, he and Majors went to see Hamilton at the appointed time, but Hamilton looked at them and turned and walked away without saying a word. Jones testified that Hamilton called the meeting because Hamilton wanted Jones to fire Majors, but Jones refused because Majors was a valued member of his staff. However, Hamilton testified that he did not tell Jones to fire Majors.

¶7.    When Alcorn began fall practice in late July 2008, the team had no helmets, pads, shoes, or uniforms. The few items of used equipment that the team did have had not been certified as safe for use as required by NCAA rules. Players had to supply their own helmets, pads, and shoes for practice. For much of the preseason, the team practiced in plain white t-shirts with handwritten numbers. Pads, helmets, shoes, and uniforms finally arrived only a week before the team's first game. Jones and the team's equipment manager, Dante Tyson-Bey, testified that they repeatedly asked Hamilton to approve orders for desperately needed uniforms and equipment, but Hamilton delayed. Tyson-Bey, who had years of experience with college and pro sports teams, described the 2008 preseason as "the most embarrassing thing [he had] ever been a part of." Jones and others also testified that the athletic

4

department failed to provide meals for the team during fall practice and failed to pay medical insurance premiums. As a result, Jones and his staff provided peanut butter and jelly sandwiches and box lunches, and injured players had to wait to see doctors.

¶8. Jones also testified that, before Hamilton arrived, Ross promised Jones that he could raise money for the football program and supplement his base salary by soliciting sponsors for TV and radio shows. According to Jones, this practice is customary in college football, and the previous coach at Alcorn, Johnny Thomas, had done the same. Jones testified that Ross directed him to talk to Thomas about the shows. Based on conversations with Ross and Thomas, Jones opened a bank account that he named the "Run and Gun" account and solicited donations and sponsorships for the shows. However, after Hamilton was hired, he ordered Jones to close the account and transfer the money to the ASU Foundation, a nonprofit organization affiliated with the university. Jones testified that he did as Hamilton instructed. Jones testified that he did pay vendors for fundraising-related expenses that were incurred before he was ordered to close the account. But Jones transferred all remaining funds, which was most of what he had raised, to the Foundation. Nonetheless, Hamilton accused Jones of opening an unauthorized bank account and refusing to turn over funds to the Foundation. A May 22, 2008 memorandum shows that, based on Hamilton's allegation, Alcorn's human resources director contacted a special assistant attorney general for advice about possible "disciplinary actions and/or termination of [Jones's] employment."

¶9. Jones also testified that Hamilton gave him permission to book hotel rooms for all games in advance of the season. Jones delegated this responsibility to an assistant coach,

5

who then booked hotels for all games, including the Capital City Classic—the season finale in Jackson against Jackson State University. Unbeknownst to Jones and his assistant coach, another Alcorn employee booked hotel rooms for the Capital City Classic at a different hotel. Hamilton later claimed that Jones had mishandled football finances by double-booking rooms for the team.

¶10. Jones testified that he met with Hamilton in June 2008 to discuss a potential shoe contract with New Balance. After discussing the issue with Hamilton, Jones agreed to a deal with New Balance, and Hamilton approved the agreement subject to certain modifications to the terms of the contract. However, in October the Southwestern Athletic Conference signed an agreement to make Nike the exclusive shoe provider for the entire conference. Hamilton directed Jones to get out of the contract with New Balance. In addition, Hamilton alleged that the agreement with New Balance was unauthorized. Jones testified that this harmed his reputation with New Balance and other companies in the industry. Jones also testified that Hamilton ordered him to cancel the New Balance contract in retaliation for Jones's continued refusal to fire Majors.

¶11. Hamilton also alleged that Jones made an $11,000 order from a Russell Athletics vendor without proper authorization. However, Jones testified that the vendor eventually acknowledged that Jones did not place the order and that the shipment and invoice were in error. Jones offered a note from the vendor's salesman to corroborate his testimony. However, even after the vendor acknowledged its error, Hamilton accused Jones of "inefficiency in resolving" the issue.

¶12.    Alcorn struggled through a 2-10 season in 2008.  On November 26, 2008, seven of Jones's assistant coaches received identical notices that their contracts would "not be renewed" and that their "employment at Alcorn . . . [would] end on December 31, 2008." Although Ross signed the notices, each stated that the decision not to renew the coach's contract was based on Hamilton's recommendation.  Ross testified that he simply followed Hamilton's recommendations, and he could not recall or lacked personal knowledge of the reasons for the non-renewals.  Jones was not given any advance warning or any reason for the non-renewal notices.  He first learned about the notices from his assistant coaches.  Jones then filed the instant lawsuit against Alcorn on December 5, 2008.[1]  Jones testified that Alcorn's abrupt termination of his assistant coaches made it impossible for him to do his job and harmed his reputation.

¶13.    At trial, Ross claimed that the assistant coaches were never really fired.  He testified that the assistant coaches were on one-year contracts, and the fact that their existing contracts were not being *renewed* did not mean that they would not be offered *new* contracts for the following year.  None of this was explained to the assistant coaches, who understandably were confused and upset by the non-renewal notices.  However, after Jones filed suit against Alcorn, all of his assistant coaches were asked to remain with the program.

---

[1] Jones filed the lawsuit in Hinds County Chancery Court; however, the case was transferred to the Claiborne County Circuit Court in February 2009.  Jones's complaint named Alcorn, IHL, Ross, and Hamilton as defendants.  The circuit court later dismissed Jones's claims against Ross, and Jones does not challenge that ruling on appeal.  The circuit court also dismissed Jones's claims against Alcorn, reasoning that Jones's contract was with IHL, so IHL was the proper state entity defendant.  Nonetheless, for simplicity, we primarily refer to the state entity defendant as "Alcorn."

7

¶14.    Five days after Jones filed suit, Alcorn gave him notice of his possible termination for cause.  In the notice, Hamilton stated that he was recommending Jones's termination "due to inefficiency and malfeasance" on four grounds: (1) "[o]pening a bank account in [his own] name and depositing fundraising monies without proper authority . . . and without following the proper procedures"; (2) buying shoes from a "non-approved" vendor "when [Alcorn] ha[d] an exclusive footwear contract with Nike"; (3) "[i]nefficiency in resolving" the alleged unauthorized order of Russell Athletics apparel; and (4) booking hotel rooms for the Capital City Classic "without authority and without following proper procedures."  The notice informed Jones that he had the right to request a due process hearing before a hearing committee, which would make a recommendation to Ross.

¶15.    Jones exercised his right to a hearing, and the hearing was held on January 16, 2009. The hearing committee was comprised of three Alcorn employees appointed by Ross.  Jones was allowed to attend the hearing and to call and question witnesses.  Jones's attorneys were allowed to attend as advisors but were not allowed to examine witnesses or present evidence. After the hearing, the committee recommended that Ross terminate Jones for malfeasance and contumacious conduct.  Ross concurred in the committee's recommendation and terminated Jones effective January 28, 2009.

¶16.    Jones appealed the hearing committee's decision and his termination to the Claiborne County Circuit Court by petition for a writ of certiorari.  *See* Miss. Code Ann. § 11-51-93 (Rev. 2012).  In April 2011, the circuit court dismissed Jones's petition and upheld the committee's decision.  Jones appealed, and in August 2013, this Court affirmed the circuit

8

court's order dismissing Jones's petition. This Court held that Jones's hearing comported with due process and that Jones could not show that the hearing committee's decision was "arbitrary and capricious." *See generally Jones v. Alcorn State Univ.*, 120 So. 3d 448 (Miss. Ct. App. 2013).

¶17. On January 28, 2009, the same day that Ross officially terminated Jones, Alcorn asked Jones's associate head coach and defensive coordinator, Earnest Collins, to serve as Alcorn's interim head coach for the 2009 season. Collins initially declined. He and Jones were close friends,[2] and he testified that he "didn't want to be in that environment" or work for a school that would treat an alumnus like Jones had been treated. However, after Jones encouraged Collins to take the job, Collins agreed to stay on one condition: he would not report to or deal with Hamilton. Alcorn agreed that Collins could report to Ross's chief of staff and would not have to deal with Hamilton.[3] Hamilton left Alcorn during 2009. Collins remained at Alcorn as the interim head coach for the 2009 and 2010 seasons before he was hired as the head coach at his alma matter, the University of Northern Colorado.

¶18. In May 2010, Alcorn filed a motion to dismiss this case for lack of subject matter jurisdiction. Alcorn argued that Jones's complaint in this case was "premature" because

_____

[2] Collins previously was an assistant coach at the University of Central Florida. He took a significant pay cut to leave Central Florida and join Jones at Alcorn.

[3] At trial, Hamilton claimed that he could not "remember" whether Collins took the job on the condition that Hamilton would not be his supervisor. Hamilton testified that the athletic director should supervise the football coach. Hamilton further stated that if he did not supervise Collins, he was "sure" there must have been "a problem." But Hamilton claimed that he could not "remember" whether there was "a problem" or whether he or someone else supervised Collins.

9

Jones's petition for writ of certiorari, which challenged his termination, remained pending in the circuit court. Alcorn argued that both cases arose "out of the same operative facts, events, and/or occurrences." Alcorn further argued that Jones was required to "exhaust his administrative remedies"—i.e., pursue his certiorari petition to a final decision—before he could pursue his complaint for damages in this case. Indeed, Alcorn argued that there could not even be a "justiciable controversy" on Jones's complaint for damages until there was "a final determination of [his] appeal seeking reinstatement of his employment." The circuit court never ruled on Alcorn's motion.

¶19. Also in May 2010, while Jones's petition for certiorari and separate complaint for damages both remained pending in circuit court, Jones filed suit in federal court against Alcorn, IHL, Hamilton, and Ross. Jones's federal complaint alleged violations of his constitutional rights and sought damages under 42 U.S.C. § 1983 and injunctive relief under *Ex Parte Young*, 209 U.S. 123 (1908). Jones also asserted state law claims, including breach of contract, breach of the duty of good faith and fair dealing, and tortious interference with contract. Jones's reasons for filing the federal complaint are unclear. In any event, in 2012, the district court ruled that the Eleventh Amendment to the United States Constitution provided Alcorn and IHL with immunity from suit in federal court. Therefore, the court dismissed all claims against Alcorn and IHL "without prejudice pursuant to the Eleventh Amendment." Jones's claims against Hamilton and Ross were also dismissed "without prejudice" for failure to serve process within 120 days.

¶20. As noted above, this Court affirmed the dismissal of Jones's petition for a writ of

10

certiorari in August 2013. In 2014, this case stirred to life in the circuit court, and eventually trial was set for January 12, 2016.

¶21. On August 10, 2015, Jones filed a motion for leave to file an amended complaint. Jones stated that the proposed amended complaint would "simplify" the case by eliminating some claims, which he conceded were not viable. Alcorn opposed Jones's motion, arguing that the proposed amended complaint asserted a "brand new" claim for breach of contract based on Jones's termination. Alcorn contended that Jones's motion should be denied because of Jones's "lack of diligence" and because the amendment would unduly delay the litigation and prejudice Alcorn. In rebuttal, Jones argued that his original complaint "gave . . . notice that [he] was claiming breach of contract." Jones also pointed out that in Alcorn's previously filed motion to dismiss for lack of subject matter jurisdiction, Alcorn itself had argued that this case was premature until Jones has exhausted his administrative remedies by appealing his termination. *See supra* ¶18.

¶22. In November 2015, the circuit court denied Jones's motion for leave to amend his complaint to assert a breach of contract/wrongful termination claim. The court found that the motion should have been filed "at a much earlier stage" and that the amendment would unduly delay the litigation and prejudice Alcorn. In addition, in December 2015, the circuit court granted Hamilton's motion to dismiss all of Jones's claims against him. The court concluded that Jones's claim against Hamilton for tortious interference with contract was barred by the MTCA. Thus, Jones's only remaining claims were against Alcorn.

¶23. The case proceeded to a four-day jury trial in January 2016. The case was submitted

11

to the jury on a theory that Alcorn breached its contract with Jones by breaching the implied covenant of good faith and fair dealing. The court instructed the jury that "all contracts contain an implied covenant of good faith and fair dealing," which "need not be written into the contract." The court further instructed the jury that Jones alleged that Alcorn had breached the covenant in three ways: "(A) By firing his assistant coaches; (B) By intentionally making false charges of financial misconduct; and (C) By failing to provide uniforms and shoes for the players in a timely fashion." The court also instructed the jury that "the trial [did] not have anything to do with" Alcorn's termination of Jones, that Jones "was still employed" as Alcorn's coach when he filed the lawsuit, and that they could not award damages based on Jones's termination or the remaining years of salary under his contract. The jury was instructed that they could award damages for emotional distress or mental anguish if Jones proved that Alcorn breached his contract, that such damages were a foreseeable consequence of the breach, and that Jones actually suffered such damages. After deliberating, the jury returned a verdict for Jones and found that Jones suffered damages of $500,000, and the court entered final judgment on the verdict.[4]

¶24. IHL filed a post-trial motion for JNOV or a new trial. The circuit court granted the motion, set aside the verdict, and entered judgment in favor of Alcorn. The court ruled that Jones's good faith and fair dealing claim failed "as a matter of law" because Jones failed to

---

[4] During oral argument, counsel for Jones stated that, based on how the case was submitted to the jury at trial, the damages found by the jury consist entirely of damages for mental anguish and emotional distress. Counsel for Jones speculated that, notwithstanding the circuit court's instructions, the jury may have awarded Jones damages based on the three years remaining on his contract.

"prove a breach of his written employment contract."

¶25. Jones filed a timely notice of appeal. On appeal, he argues that the circuit court erred by granting Alcorn's motion for JNOV. As noted above, he also argues that the circuit court erred prior to trial by denying his motion for leave to amend his complaint and by dismissing his tortious interference claim against Hamilton. Following oral argument, we entered an order directing the parties to file supplemental briefs addressing several issues, primarily related to Jones's good faith and fair dealing claim and the MTCA.

## ANALYSIS

### I. Jones has a viable claim for breach of the implied covenant of good faith and fair dealing, but the claim is subject to the MTCA.

¶26. We first determine whether Jones has a viable claim for breach of the implied covenant of good faith and fair dealing and, if so, whether and how the MTCA applies to that claim. All of the issues related to this claim are issues of law or statutory interpretation, which we review de novo. *Kelley LLC v. Corinth Pub. Utils. Comm'n*, 200 So. 3d 1107, 1112-13 (¶14) (Miss. Ct. App. 2016).

#### A. "All contracts contain an implied covenant of good faith and fair dealing in performance and enforcement."[5]

¶27. The implied covenant of good faith and fair dealing, inherent in every contract,

> is based on fundamental notions of fairness, and its scope necessarily varies according to the nature of the agreement. Some conduct, such as subterfuge and evasion, clearly violates the duty. However, the duty may not only proscribe undesirable conduct, but may require affirmative action as well. A party may thus be under a duty not only to refrain from hindering or preventing

---

[5] *Cenac v. Murry*, 609 So. 2d 1257, 1272 (Miss. 1992).

13

the occurrence of conditions of his own duty or the performance of the other party's duty, but also to take some affirmative steps to cooperate in achieving these goals.

*Cenac*, 609 So. 2d at 1272 (quoting E. Allan Farnsworth, *Contracts* § 7.17, at 526-27 (1982)). "Good faith is the faithfulness of an agreed purpose between two parties, a purpose which is consistent with justified expectations of the other party. The breach of good faith is bad faith characterized by some conduct which violates standards of decency, fairness or reasonableness." *Id.* Stated differently, "[t]he covenant holds that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Ferrara v. Walters*, 919 So. 2d 876, 883 (¶19) (Miss. 2005) (internal quotation mark omitted). As stated above, this covenant is implied in "[a]ll contracts." *Cenac*, 609 So. 2d at 1272; *see also id.* at 1259 ("[T]he covenant of good faith and fair dealing [is] inherent in every contract in our law.").

> **B.** **A breach of the implied covenant of good faith and fair dealing does not require a breach of any express term of the contract.**

¶28.    In granting Alcorn's motion for JNOV, the circuit court ruled that Jones's "good faith and fair dealing claims must be rejected as a matter of law" because Jones "did not prove a breach of his written employment contract." The circuit court cited this Court's statement in *Daniels v. Parker & Associates Inc.*, 99 So. 3d 797 (Miss. Ct. App. 2012), that "to have a breach of the duty of implied good faith and fair dealing there must first be an existing contract *and then a breach of that contract*." *Id.* at 801 (¶13) (emphasis added). It certainly is true that "[t]he duty of good faith and fair dealing arises from the existence of a *contract*

14

between parties." *Am. Bankers' Ins. Co. of Fla. v. Wells*, 819 So. 2d 1196, 1207 (¶35) (Miss. 2001). Thus, *Daniels* was correct insofar as it stated that the implied covenant of good faith and fair dealing arises only where there is an "existing contract." *Daniels*, 99 So. 3d at 801 (¶13). However, the further suggestion that there must also be a breach of an express provision of that contract, *id.*, was dicta and a misstatement of the law.

¶29. The suggestion was dicta because it was not necessary to this Court's decision in *Daniels*. *See Smith v. Normand Children Diversified Class Tr.*, 122 So. 3d 1234, 1237 (¶5) (Miss. Ct. App. 2013) ("Dicta are statements not necessary to the court's ruling." (internal quotation mark omitted)). *Daniels* involved a dispute between an insurance salesman (Daniels) and an agency (Parker) for which Daniels formerly sold policies as an independent contractor. *Daniels*, 99 So. 3d at 798 (¶2). After Daniels ended his relationship with Parker, a prospective employer required Daniels to obtain a "release" from Parker. *Id.* at 799 (¶5). Daniels also claimed that the release was necessary because his contract with Parker had been an "exclusive contract." *Id.* Parker declined to sign the release because it asked Parker to confirm that Daniels had satisfied all of his financial obligations to the agency, and Daniels still owed significant money to Parker due to "charge backs" against his commissions. *Id.* at (¶6). Parker also denied that its contract with Daniels had been "exclusive." *Id.* at 799-800 (¶¶5, 9). Daniels then sued Parker, alleging that its refusal to sign the release was a breach of the implied covenant of good faith and fair dealing. *Id.* at 799 (¶7). The circuit court granted summary judgment for Parker, and this Court affirmed. We held Daniels's claim failed for four reasons: (1) the contract between Daniels and Parker ended long before

15

the release was requested, so there was no existing contract between the parties; (2) the contract was not "exclusive," so no release was needed; (3) the release was a requirement of the prospective employer that "had no relation to any agreements between Parker and Daniels"; and (4) Parker was justified in refusing to sign the release because Daniels owed Parker money. *Id.* at 801-02 (¶¶14-18). In short, we held that Daniels's claim failed as a matter of law because the implied covenant of good faith and fair dealing terminated with the contract and because Parker acted in good faith. We did *not* hold that technical compliance with the express terms of a contract necessarily or always precludes a claim for breach of the implied covenant of good faith and fair dealing.

¶30. Neither the Mississippi Supreme Court nor this Court has ever held that a good faith and fair dealing claim requires a breach of an express term of the contract. *Cenac v. Murray*, *supra*, which the Supreme Court aptly described as an "unusual and interesting case" about a contract to sell "a little country store in McLaurin," is the leading Mississippi case on the implied covenant of good faith and fair dealing. *Cenac*, 609 So. 2d at 1259. In *Cenac*, the Supreme Court held that the plaintiffs, who bought the store, "clearly proved" that the defendants, who sold the store to them, "breached the covenant of good faith and fair dealing inherent in every contract in our law." *Id.* Notably, the Supreme Court's extended discussion of the relevant facts and law did not identify any express term of the parties' contract that the defendants had breached. Rather, the Court held that the defendants breached their duty of good faith and fair dealing by engaging in a course of "abusive, aberrant, intimidating, harassing behavior" that made the plaintiffs' "life a living hell" and

16

undermined their efforts to operate the store. *Id.* at 1272. Thus, *Cenac*'s reasoning and result clearly indicate that a breach of the implied covenant of good faith and fair dealing does not require a breach of any express provision of the contract.

¶31.    In addition, in an unpublished decision, the Fifth Circuit has rejected the argument that "Mississippi law holds that a party cannot breach the duty of good faith and fair dealing if it honors the [express] terms of the agreement." *Crosby Mem'l Hosp. v. Abdallah*, 48 F. App'x 102, 2002 WL 31016466, at *13 n.9 (5th Cir. 2002). As the Fifth Circuit correctly concluded, albeit without elaboration, that argument "is a misreading of the relevant case law." *Id.*

¶32.    Moreover, courts in other states have held that a plaintiff need not prove a breach of an express provision of the contract. For example, the United States Court of Appeals for the Seventh Circuit stated that "[i]t is, of course, possible to breach the implied duty of good faith even while fulfilling all of the terms of the written contract." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 766 (7th Cir. 2010) (applying Wisconsin law). The California Supreme Court likewise held that "breach of a specific provision of the contract is not a necessary prerequisite" to a claim for breach of the implied covenant of good faith and fair dealing. *Carma Developers (Cal.) Inc. v. Marathon Dev. Cal. Inc.*, 826 P.2d 710, 727 (Cal. 1992). And the United States Court of Appeals for the Federal Circuit specifically emphasized that "a breach of the *implied* duty of good faith and fair dealing does not require a violation of an *express* provision in the contract." *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 994 (Fed. Cir. 2014) (applying federal law). A number of other courts have

17

reached the same conclusion,[6] and we agree.

¶33.    Logically, if the covenant of good faith and fair dealing required *only* technical compliance with the contract's express terms, then "the implied covenant would be a mere redundancy." *Doe*, 177 F. Supp. 3d at 612. "[T]he covenant would have no practical meaning, for any breach thereof would necessarily involve breach of some other term of the contract." *Carma Developers*, 826 P. 2d at 727. We decline to adopt a rule that "would render the good faith and fair dealing doctrine superfluous." *Rekhter*, 322 P.3d at 1041.

¶34.    As the Supreme Court reasoned in *Cenac*, the implied covenant of good faith and fair

---

[6] *See, e.g.*, *Rekhter v. State, Dep't of Soc. & Health Servs.*, 323 P.3d 1036, 1041 (Wash. 2014) (rejecting the argument that there can "never be a violation of a duty of good faith and fair dealing unless there [is] also a violation of an express contract term"); *Hilton Hotels Corp. v. Butch Lewis Prods. Inc.*, 808 P.2d 919, 922-23 (Nev. 1991) ("Where the terms of a contract are literally complied with but one party to the contract deliberately countervenes the intention and spirit of the contract, that party can incur liability for breach of the implied covenant of good faith and fair dealing."); *CR-RSC Tower I LLC v. RSC Tower I LLC*, 32 A.3d 456, 495 (Md. Ct. Sp. App. 2011) ("[E]ven though a party may comply with the technical terms of a contract, it may still be liable if it acts in a way to prevent the other party from performing his obligations under the contract."), *aff'd*, 56 A.3d 170 (Md. 2012); *Garrett v. BankWest Inc.*, 459 N.W.2d 833, 841 (S.D. 1990) (stating that a party may be liable for breach of the implied covenant of good faith and fair dealing even if its conduct does not "violate any of the express terms of the contract agreed to by the parties"); *Best v. U.S. Nat'l Bank of Or.*, 739 P. 2d 554, 557 (Or. 1987) (holding that conduct may violate the implied obligation of good faith even if it is not does not violate the express provisions of the parties' contract); *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 612 (D. Mass. 2016) ("[A] party may breach the covenant of good faith and fair dealing without breaching any express term of that contract."); *Phelps v. Frampton*, 170 P.3d 474, 484 (¶35) (Mont. 2007) (holding that "breach of an express contractual term is not a prerequisite to breach of the implied covenant of good faith and fair dealing" (brackets, quotation marks omitted)); *Markham v. Bradley*, 173 P.3d 865, 871 (Utah Ct. App. 2007) ("As distinguished from a contract's express terms, the covenant is based on judicially recognized duties not found within the four corners of the contract." (quotation marks omitted)); *see also* Steven J. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv. L. Rev. 369, 371 (1980) ("[E]xpress contract terms alone are insufficient to determine a party's good faith in performance.").

18

dealing protects the parties' "justified expectations" that the contract will be performed in a manner consistent with its "agreed purpose." *Cenac*, 609 So. 2d at 1272. Because it is rarely possible or practical for contracting parties to anticipate and address every conceivable issue that may arise in the future performance of the contract, the doctrine substitutes a general duty of good faith and fair dealing for details of the performance that the contract does not address expressly. *See Metcalf Constr.*, 742 F.3d at 991; Burton, 94 Harv. L. Rev. at 371, 393. Thus, in *Cenac*, the parties' contract did not expressly prohibit "abusive, aberrant, intimidating, harassing behavior" that would make the plaintiffs' lives "a living hell." *Cenac*, 609 So. 2d at 1272. Nonetheless, such conduct violated the implied duty of good faith and fair dealing, based on the plaintiffs' justified expectations that the defendants would not undermine their operation of the store. *See id.*

¶35. Similarly, Jones argues that he justifiably expected that Alcorn would, among other things, provide basic equipment for his team and would not fire seven of his assistant coaches without warning. He argues, in essence, that proper equipment and assistant coaches were necessary to the agreed purpose of his contract, which was to coach a Division I college football team. Alcorn, in contrast, argues that it had *no duty* to provide *any* helmets, pads, or assistant coaches because the express provisions of Jones's contract do not address those issues. Alcorn contends that as long as it paid Jones his salary, Jones had no possible claim for breach of the implied covenant of good faith and fair dealing. We disagree. Alcorn's argument would render the implied duty of good faith and fair dealing redundant and superfluous. Consistent with *Cenac*'s reasoning and result, we hold that it is possible to

19

breach the implied covenant of good faith and fair dealing even if there is no breach of an express provision of the parties' contract.[7]

### C. An employment contract for a specified period of time that may be terminated only for cause contains an implied covenant of good faith and fair dealing.

¶36. Alcorn also argues that employment contracts do not contain an implied covenant of good faith and fair dealing. Alcorn relies on this Court's statement that "this implied duty has been said not to apply to employment contracts." *Lippincott v. Miss. Bureau of Narcotics*, 856 So. 2d 465, 467 (¶7) (Miss. Ct. App. 2003) (citing *Hartle v. Packard Elec.*, 626 So. 2d 106, 110 (Miss. 1993)). However, this statement was also dicta, and it was an overstatement. The implied covenant of good faith and fair dealing is limited or inapplicable in the context of *at-will* employment. In contrast, an employment contract for a specified period of time that may be terminated only for cause contains an implied covenant of good faith and fair dealing—the same implied covenant inherent in all other contracts under Mississippi law.

¶37. In *Lippincott*, immediately after the above-quoted statement, this Court added the following: "In *Hartle*, the [Supreme Court] may only have been addressing the question of whether an implied duty was relevant to wrongful discharge" because "[t]o require good faith

---

[7] A breach of the implied covenant of good faith and fair dealing should not be confused with a tortious breach of contract. "Tortious breach of contract requires, in addition to a breach of contract, some intentional wrong, insult, abuse, or negligence so gross as to constitute an independent tort." *Braidfoot v. William Carey Coll.*, 793 So. 2d 642, 655 (¶45) (Miss. Ct. App. 2000) (quoting *Southern Nat. Gas Co. v. Fritz*, 523 So. 2d 12, 19-20 (Miss. 1987)). A claim for breach of the implied covenant of good faith and fair dealing is a distinct claim. *See id.* at 651-52 (¶¶28-32).

in the discharge of an at-will employee would essentially repeal the at-will doctrine." *Id.* As a matter of fact, *all* that the Supreme Court held in *Hartle* was that (1) the good faith "provision of . . . *the Uniform Commercial Code* . . . does not apply to employment contracts" and (2) "*at-will employment relationships* are not governed by an implied covenant of good faith and fair dealing." *Hartle*, 626 So. 2d at 110 (emphasis added).[8] Neither holding has any significance in this case. First, under Mississippi *common law*, "*all contracts* contain an implied covenant of good faith and fair dealing." *Morris v. Macione*, 546 So. 2d 969, 971 (Miss. 1989) (emphasis added); *accord, e.g.*, *Cenac*, 609 So. 2d at 1272; *UHS-Qualicare Inc. v. Gulf Coast Cmty. Hosp. Inc.*, 525 So. 2d 746, 757 n.8 (Miss. 1987) ("Every contract contains an implied covenant of good faith and fair dealing."). Therefore, although the UCC does not apply, our common law imposes the same duty of good faith and fair dealing. Second, Jones was not an at-will employee—he had a written contract for employment for a specified term that was terminable only for cause.

¶38. Our decision in *Lippincott* did not add anything to *Hartle*'s holding. *Lippincott* involved a lawsuit by a confidential informant (CI) against the Mississippi Bureau of Narcotics (MBN) for injuries that the CI suffered when he was shot during a drug buy.

---

[8] We note that in *Empiregas Inc. of Kosciusko v. Bain*, 599 So. 2d 971 (Miss. 1992), the Supreme Court held that the employer had a "duty . . . to deal in good faith" with an at-will employee. *Id.* at 977. Although this duty does not alter Mississippi's at-will employment doctrine, *see id.* at 974, the Supreme Court did hold that it required the employer to pay bonuses that the at-will employee had earned and precluded enforcement of the employee's covenant not to compete, *see id.* at 974-77. *See also E. Fishing & Rental Tools Co. v. Blaney*, No. 5:10-CV-120, 2012 WL 3154975, at *2 (S.D. Miss. Aug. 2, 2012) ("While the duty to deal in good faith does not alter Mississippi's 'at will' rule, it can affect the parties' rights vis-a-vis an employment contract and a non-compete agreement.").

21

*Lippincott*, 856 So. 2d at 466 (¶1). We ultimately held that it was irrelevant whether the CI "was an employee or an independent contractor . . . because even presuming a good faith duty [was] applicable to [his agreement with MBN], we [could not] find that the duty was breached." *Id.* at 468 (¶8). We held that the CI's claim failed as a matter of law because, at most, he alleged that MBN was negligent, and his "claim that he had a reasonable expectation of a safe work environment was untenable" given the nature of his work. *Id.* at (¶¶9-10).

¶39.   In summary, the Supreme Court has held only that the implied covenant of good faith and fair dealing does not limit an employer's right to terminate a purely at-will employee. However, the Supreme Court has never held that an employment contract for a specified term that is terminable only for cause does not contain an implied covenant of good faith and fair dealing. Rather, the Supreme Court has stated repeatedly that such a covenant is implied and inherent in "all contracts." Alcorn provides no persuasive reason why this doctrine would not apply to a contract like its contract with Jones. Accordingly, we hold that an employment contract for a specified term that is terminable only for cause contains an implied covenant of good faith and fair dealing.

### D.   The MTCA applies to a claim for breach of the implied covenant of good faith and fair dealing.

¶40.   Alcorn argued in the circuit court and continues to argue on appeal that the MTCA applies to Jones's claim for breach of the implied covenant of good faith and fair dealing. Based on the plain language of the MTCA, as interpreted by the Mississippi Supreme Court, we are compelled to agree.

22

¶41. "By enacting [the MTCA], the Legislature defined the parameters for sovereign immunity within this state." *City of Jackson v. Estate of Stewart ex rel. Womack*, 908 So. 2d 703, 709 (¶27) (Miss. 2005). As relevant to this case, the MTCA provides that the State and its political subdivisions are "immune from suit at law or in equity on account of any wrongful or tortious act or omission *or breach of implied term or condition of any warranty or contract*." Miss. Code Ann. § 11-46-3(1) (Rev. 2012) (emphasis added). The Legislature amended the Act to add the italicized phrase in 1992. *Estate of Stewart*, 908 So. 2d at 709 (¶29). In *Estate of Stewart*, the Supreme Court held that the adjective "tortious" does *not* modify or limit the breadth of the italicized phrase. *Id.* at 711 (¶37). Accordingly, the Court held the statute grants the State and its political subdivisions immunity from suit for *any* alleged breach of an implied term or condition of any contract. *Id.* at (¶¶36-38). In light of the Supreme Court's holding in *Estate of Stewart*, we agree with Alcorn that the MTCA applies to Jones's claim alleging a breach of the *implied* covenant of good faith and fair dealing. *See Pike Cty. v. Indeck Magnolia LLC*, No. 3:11-CV-57, 2011 WL 3439935, at *2 (S.D. Miss. Aug. 5, 2011) (concluding that under *Estate of Stewart* a claim for breach of the implied covenant of good faith and fair dealing is within the scope of section 11-46-3 and subject to the MTCA).

¶42. Jones argues that section 11-46-3 does not apply to the implied covenant of good faith and fair dealing because it is a different kind of implied term. He argues that section 11-46-3 only applies to implied contractual terms in "personal injury tort" cases. He also cites *Weible v. University of Southern Mississippi*, 89 So. 3d 51 (Miss. Ct. App. 2011), which stated that

23

"[t]he Mississippi Supreme Court has confirmed that the State is not immune from suit for breach of its written contractual obligations." *Id.* at 60 (¶25); *see also id.* (stating that *Estate of Stewart* "reaffirmed that the MTCA does not apply to actions for breach of express contract").

¶43.    However, we cannot agree with Jones's argument. "The function of the Court is not to decide what a statute should provide, but to determine what it does provide." *Lawson v. Honeywell Int'l Inc.*, 75 So. 3d 1024, 1027 (¶7) (Miss. 2011). Moreover, once the Mississippi Supreme Court has interpreted a statute, the function of this Court is to apply the Supreme Court's interpretation. *See Miss. Valley Silica Co. v. Barnett*, 227 So. 3d 1102, 1127-28 (¶67-70) (Miss. Ct. App. 2016), *cert. granted*, 216 So. 3d 1151 (Miss. 2017), *cert. dismissed*, No. 2013-CT-01296-SCT (Miss. Sept. 28, 2017). The Supreme Court has now held that section 11-46-3 applies—*without limitation*—to claims alleging "breach of [an] implied term or condition of any . . . contract." Miss. Code Ann. § 11-46-3(1); *Estate of Stewart*, 908 So. 2d at 711 (¶¶36-38). In light of the Supreme Court's ruling, we cannot rewrite the same language to apply only in "personal injury tort" cases. Therefore, Jones is correct that the MTCA does not apply to any claim alleging a breach of the *express* terms of a contract; however, the MTCA does apply to a claim for breach of any implied term of any contract, including the implied covenant of good faith and fair dealing.[9]

---

[9] We recognize that in *University of Southern Mississippi v. Williams*, 891 So. 2d 160 (Miss. 2004), a claim for breach of the implied covenant of good faith and fair dealing was treated as a contract claim that was not subject to the MTCA. *See generally id.* at 168-175 (¶¶18-45). However, *Williams* did not address the question whether such a claim is subject to the MTCA. *See Price v. State*, 336 So. 2d 1311, 1312 (Miss. 1976) (explaining that statements on matters "not . . . squarely before" the Court are dicta). More important,

24

**E.     The MTCA's limited waiver of immunity also applies
        to a claim for breach of the implied covenant of good
        faith and fair dealing.**

¶44.    Section 11-46-3 codifies sovereign immunity in this State, but "[section] 11-46-5 provide[s] a limited waiver of the immunity granted under [s]ection 11-46-3." *Estate of Stewart*, 908 So. 2d at 711 (¶38); *see* Miss. Code Ann. § 11-46-5(1) (Rev. 2012) ("Notwithstanding the immunity granted in Section 11-46-3, . . . the immunity of the state and its political subdivisions from claims for money damages arising out of the torts of such governmental entities and the torts of their employees while acting within the course and scope of their employment is hereby waived . . . ."). And in *Estate of Stewart*, the Supreme Court specifically held that the defendant's "immunity for claims that it breached an implied contractual term" was "waived by [s]ection 11-46-5, to the extent of the . . . maximum damages allowed by [s]ection 11-46-15." *Estate of Stewart*, 908 So. 2d at 711 (¶39); *see* Miss. Code Ann. § 11-46-15(c) (Rev. 2012) (providing that a governmental entity's liability under the MTCA shall not exceed $500,000).

¶45.    In a subsequent case, this Court discussed *Estate of Stewart*'s holding. This Court noted that the waiver of immunity in section 11-46-5 "contains no explicit reference" to claims based on implied contractual terms. *1704 21st Ave. Ltd. v. City of Gulfport*, 988 So. 2d 412, 417 (¶14) (Miss. Ct. App. 2008). However, "the [S]upreme [C]ourt in *Estate of Stewart* determined, without explanation, that the section 11-46-5 waiver applied to a breach

---

*Williams* was decided prior to the Supreme Court's decision in *Estate of Stewart*, which overruled prior precedent holding that the MTCA did not apply to a claim for breach of an implied contract. *See Estate of Stewart*, 908 So. 2d at 709-11 (¶¶29-39).

25

of [an implied contractual term]." *Id.* "Following the same analysis," we held that section 11-46-5's waiver of immunity applied to the implied contract claims at issue in that case. *Id.*; *accord Pike Cty.*, 2011 WL 3439935, at *2 & n.3 (agreeing that *Estate of Stewart* held that section 11-46-5 waives immunity for the tortious or "*nontortious* breach of implied term or condition of any . . . contract"). Thus, the Supreme Court and this Court have concluded that section 11-46-5 waives sovereign immunity for claims alleging breach of implied contractual terms.

¶46. Nonetheless, Alcorn argues that section 11-46-5's waiver of immunity does not apply to a breach of the implied covenant of good faith and fair dealing. Alcorn relies on subsection (2) of section 11-46-5, which provides that

> an employee shall not be considered as acting within the course and scope of his employment and a governmental entity shall not be liable or be considered to have waived immunity for any conduct of its employee if the employee's conduct constituted fraud, *malice*, libel, slander, defamation or any criminal offense other than traffic violations.

Miss. Code Ann. § 11-46-5(2) (emphasis added). Alcorn argues that governmental entities have not waived immunity for any breach of the implied covenant of good faith and fair dealing because "malice is an essential element of said claim."

¶47. However, we disagree that subsection 11-46-5(2) applies to a claim for a breach of the implied covenant of good faith and fair dealing. Alcorn cites no cases holding that "malice" is an essential element of such a claim. Rather, Alcorn cites cases addressing the distinct tort of tortious interference with contract or discussing "bad faith" as that term is used in other contexts.

26

¶48. "Malice" means that the defendant engaged in intentional conduct "with the unlawful purpose of causing damage and loss [to the plaintiff], without right or justifiable cause on the part of the defendant." *Par Indus. Inc. v. Target Container Co.*, 708 So. 2d 44, 48 (¶8) (Miss. 1998) (quoting *Cenac*, 609 So. 2d at 1268-69) (discussing the elements of a claim for tortious interference with contract). Applying subsection 11-46-5(2), the Supreme Court recently held that "malice" is an essential element of a claim for *tortious interference with contract*, but "a tortious breach of contract claim may be proven without proof of malice." *Springer v. Ausbern Constr. Co.*, 231 So. 3d 980, 988 (¶30) (Miss. 2017). The Court held that malice is *not* an essential element of the latter claim even though a tortious breach of contract requires proof of "some intentional wrong, insult, abuse, or negligence so gross as to constitute an independent tort." *Id.* (quoting *Wilson v. Gen. Motors Acceptance Corp.*, 883 So. 2d 56, 66 (¶39) (Miss. 2004)).

¶49. We reach a similar conclusion in this case. The covenant of good faith and fair dealing is not easily defined, and its meaning varies based on the context and nature of the agreement. *See Cenac*, 609 So. 2d at 1272. However, in *Cenac*, the Supreme Court held that the covenant may require a party "not only to refrain from hindering or preventing . . . the [other party's] performance . . . , but also to take some affirmative steps to cooperate in achieving the[] goals" of the contract. *Id.* "Good faith" is "faithfulness" to the contract's "agreed purpose" and the "justified expectations of the other party." *Id.* "The breach of good faith is bad faith characterized by some conduct which violates standards of decency, fairness or reasonableness." *Id.*

27

¶50.    We conclude that—like a tortious breach of contract—a breach of the duty of good faith "may be proven without proof of malice." *Springer*, 231 So. 3d at 988 (¶30).  A party may fall short of "standards of decency, fairness or reasonableness," *Cenac*, 609 So. 2d at 1272, without engaging in intentional, malicious conduct "with the unlawful purpose of causing damage and loss" to the plaintiff, *Par Indus. Inc.*, 708 So. 2d at 48 (¶8).

¶51.    Persuasive authority supports our conclusion. For example, the California Supreme Court held that it is not "necessary that the party's conduct be dishonest.  Dishonesty presupposes subjective immorality; *the covenant of good faith can be breached for objectively unreasonable conduct, regardless of the actor's motive*." *Carma Developers*, 826 P.2d at 727 (emphasis added).  Applying Washington law, the United States Court of Appeals for the Ninth Circuit held that the fact that "a party can breach the duty of good faith and fair dealing by acting dishonestly or unlawfully does *not* mean that dishonesty or an unlawful purpose is a necessary predicate to proving bad faith." *Scribner v. Worldcom Inc.*, 249 F.3d 902, 910 (9th Cir. 2001) (emphasis added).  And applying New Hampshire law, the United States Court of Appeals for the First Circuit squarely rejected the argument that "proof of malice or ill will is necessary to find a breach of the implied obligation of good faith and fair dealing." *deVries v. St. Paul Fire & Marine Ins. Co.*, 716 F.2d 939, 943 (1st Cir. 1983).[10]

---

[10] *See also Restatement (Second) of Contracts* § 205 cmt. d (1981) ("Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified.  But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and

28

¶52. Because "malice" is not an essential element of a claim for breach of the implied covenant of good faith and fair dealing, we hold that a plaintiff may bring such a claim against a governmental entity under the MTCA. That is, section 11-46-5 provides a limited waiver of sovereign immunity for damages arising from such a breach.

¶53. We qualify our holding in one respect. At trial, at Jones's request, the circuit court instructed the jury that Jones alleged that Alcorn had breached the implied covenant of good faith and fair dealing by, among other things "intentionally making false charges of financial misconduct." This particular allegation is simply a re-labeled claim for libel, slander, or defamation. The plain language of the MTCA makes clear that sovereign immunity is *not* waived for any claim of "libel, slander, [or] defamation." Miss. Code Ann. § 11-46-5; *Williams v. City of Belzoni*, 229 So. 3d 171, 176 (¶15) (Miss. Ct. App. 2017). Furthermore, "[e]fforts to re-label tort suits as something else in order to avoid some part of the MTCA are ineffective." *Kelley LLC*, 200 So. 3d at 1117-18 (¶29) (quoting *Alexander v. Taylor*, 928 So. 2d 992, 995 (¶10) (Miss. Ct. App. 2006)) (brackets omitted). We look to the substance of the claim, not its label. Therefore, we hold that Alcorn is immune from liability for any claim predicated on this particular allegation. With that qualification, however, we hold that a claim for breach of the implied covenant of good faith and fair dealing is a viable claim under the MTCA.

> **F.** **Jones's good faith and fair dealing claim must be dismissed without prejudice because he did not comply with the MTCA's pre-suit notice requirements; however, the statute of limitations has**

slacking off, willful rendering of imperfect performance . . . .").

29

**been tolled during the pendency of this suit.**

¶54. Under the MTCA, any person with a claim against a governmental entity must file a notice of the claim with the entity's chief executive officer at least ninety days before filing suit. Miss. Code Ann. § 11-46-11 (Rev. 2012). The purpose of pre-suit notice is to ensure that the governmental entity is informed of any claims against it. *O'Hara v. City of Hattiesburg*, 222 So. 3d 314, 317 (¶8) (Miss. Ct. App. 2017). "Strict compliance with statutory notice is required, regardless of why the plaintiff failed to provide notice." *Price v. Clark*, 21 So. 3d 509, 518 (¶16) (Miss. 2009). "[T]he ninety-day notice requirement . . . is a hard-edged, mandatory rule which the [Supreme] Court strictly enforces." *Id.* at 519 (¶18) (quoting *Univ. of Miss. Med. Ctr. v. Easterling*, 928 So. 2d 815, 820 (¶23) (Miss. 2006)) (citations and internal quotation mark omitted). Therefore, "notice-of-claim letters . . . filed after the suit is commenced will not constitute valid notice or prevent dismissal of a suit." *Id.* at 522 (¶29). A plaintiff's "failure to provide proper statutory notice cannot be cured by serving notice-of-claim letters after a complaint is filed." *Id.* at (¶30).

¶55. In the present case, Jones did not file pre-suit notice pursuant to the MTCA. He filed the instant lawsuit on December 5, 2008, but he did not serve a notice of claim on the IHL Board of Trustees until January 29, 2009. For reasons that are unclear, he also served a second notice on the IHL Board on April 7, 2009. Alcorn argues that Jones's failure to serve pre-suit notice as required by the MTCA requires dismissal of the lawsuit. Jones makes only one argument in response: that the issue is "pure[ly] academic" because his good faith and fair dealing claim is not subject to the MTCA. However, for the reasons discussed above,

30

we have held that Jones's claim *is* subject to the MTCA. Therefore, Alcorn is correct that Jones's good faith and fair dealing claim must be dismissed due to his failure to file pre-suit notice under the MTCA. *Price*, 21 So. 3d at 522 (¶29).

¶56. However, when a plaintiff in an MTCA case fails to provide the requisite pre-suit notice, the case should be dismissed *without prejudice*. *Tallahatchie Gen. Hosp. v. Howe*, 154 So. 3d 29, 32 (¶¶11-13) (Miss. 2015); *O'Hara*, 222 So. 3d at 317 (¶12). Moreover, the Supreme Court has held that a complaint that is properly served but filed without proper pre-suit notice tolls the statute of limitations until the complaint is dismissed for lack of proper pre-suit notice. *See Howe*, 154 So. 3d at 32 (¶¶11-14); *Price*, 21 So. 3d at 521-22 (¶¶27-31). Here, Jones filed his complaint well within the MTCA's one-year statute of limitations, albeit without pre-suit notice, and properly served the complaint. Accordingly, on remand, Jones's good faith and fair dealing claim should be dismissed without prejudice to his ability to refile the claim after he complies with the MTCA's pre-suit notice requirements.

¶57. Although we recognize that "pre-suit notice" may be a pointless exercise at this stage of the litigation, our holding that Jones's good faith and fair dealing claim is subject to the MTCA is not a technicality. For one thing, as discussed above, the MTCA makes clear that Jones cannot sue the State for slander or libel simply because he has re-labeled the claim as a good faith and fair dealing claim. The State retains full sovereign immunity against any claim for slander or libel, and such a claim was improperly submitted to the jury as part of Jones's good faith and fair dealing claim. Accordingly, the MTCA would require us to set aside the verdict for that reason alone. In addition, the trial judge must "hear and determine"

any claim brought under the MTCA "without a jury." Miss. Code Ann. § 11-46-13(1) (Rev. 2012). Therefore, if Jones refiles his good faith and fair dealing claim under the MTCA and the case proceeds to trial, the trial judge must determine that claim.

## II. Jones should have been allowed to pursue a breach of contract claim based on his termination.

### A. The circuit court abused its discretion by denying Jones's motion for leave to amend.

¶58. Jones's original complaint, filed on December 5, 2008, sought damages for various alleged breaches of contract, breaches of the duty of good faith and fair dealing, and tortious interference with his contract. Jones's complaint also sought injunctive relief, including a temporary restraining order to prevent Alcorn from terminating his contract for employment, which he apparently anticipated. Five days after he filed suit, Jones received a notice of possible termination. After an administrative hearing, Alcorn terminated Jones's employment, and the circuit court and this Court later upheld his termination on appeal. While Jones appealed his termination, there was little activity in this case, and Jones did not move to amend his complaint to allege specifically that his termination was a breach of his contract until August 10, 2015.

¶59. Alcorn opposed Jones's motion for leave to amend, arguing, among other things, that Jones was guilty of "undue delay" and a "lack of diligence." Alcorn also argued that the amendment "would cause undue delay in the litigation" and "seriously prejudice" Alcorn by injecting a "brand new . . . theory of liability" into the case. Alcorn emphasized that Jones filed the motion only five months prior to trial, after the case had been pending for over six

years.  In addition, Alcorn claimed that Jones had "admitted" in his deposition "that he was not suing [Alcorn] for wrongfully terminating his employment."  The circuit court agreed with Alcorn that the amendment would "cause undue delay in the litigation" and "undue prejudice" to Alcorn.  Therefore, the court denied Jones's motion for leave to amend.  On appeal, Alcorn defends the circuit court's ruling on those same grounds.

¶60.  "Motions for leave to amend are left to the trial judge's sound discretion." *Simmons v. Thompson Mach. of Miss. Inc.*, 631 So. 2d 798, 800 (Miss. 1994).  Therefore, we review the trial judge's decision to grant or deny leave to amend under the abuse of discretion standard of review.  *Webb v. Braswell*, 930 So. 2d 387, 392 (¶8) (Miss. 2006).  Leave to amend may be denied based on a "lack of diligence" and "undue delay" or "bad faith or dilatory motive on the part of the movant."  *Id.* at 393-95 (¶¶9, 11).  Leave may also be denied if the amendment would cause "undue prejudice to the opposing party" or "undue delay in the litigation."  *Id.*  However, Rule 15(a) makes clear that leave to amend a pleading "*shall* be freely given when justice so requires."  Miss. R. Civ. P. 15(a) (emphasis added).  "[T]his mandate is to be heeded.  [I]f the underlying facts and circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."  *Frank v. Dore*, 635 So. 2d 1369, 1375 (Miss. 1994) (alteration omitted; quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Therefore, "an amendment should be denied *only* if the amendment would cause actual prejudice to the opposite party."  *TXG Intrastate Pipeline Co v. Grossnickle*, 716 So. 2d 991, 1011 (¶59) (Miss. 1997) (emphasis added).

33

¶61. For two primary reasons, we conclude that the circuit court abused its discretion by denying Jones's motion for leave to amend his complaint. First, the propriety of Jones's termination under his contract has been part of this case from the beginning. As noted above, Jones's original complaint alleged that Alcorn had already breached his contract in several respects and specifically sought a temporary restraining order to prohibit Alcorn from "terminating [his] contract of employment." Moreover, Alcorn moved to dismiss Jones's complaint on the ground that Jones was "appealing [Alcorn's] decision to terminate [his] employment and seeking reinstatement of his employment." Alcorn argued that Jones's appeal of his termination arose "out of the same operative facts, events and/or circumstances as [this] lawsuit." Alcorn further argued that *this case* was "premature"—and the circuit court "lack[ed] subject matter jurisdiction"—until Jones had "exhaust[ed] his administrative remedies" by litigating his administrative appeal to "a final resolution." Indeed, Alcorn claimed: "Absent a final determination of [Jones's] appeal seeking reinstatement of his employment, *no justiciable controversy even exists upon which to bring [Jones's] lawsuit in this [c]ourt*." (Emphasis added).[11]

¶62. Alcorn's positions in this case have been inconsistent. The issue in the prior administrative hearing and appeal was whether Alcorn properly terminated Jones for cause under his contract. *See generally Jones*, 120 So. 3d 448. And Alcorn initially argued that the two cases were so intertwined that this case was "premature"—and there not even a

---

[11] The circuit court never ruled on Alcorn's motion to dismiss for lack of subject matter jurisdiction; however, activity in this case effectively ceased until after this Court upheld Jones's termination on appeal.

"justiciable controversy"—until there had been a final ruling on Jones's challenge to his termination. Yet, in subsequently opposing Jones's motion for leave to amend his complaint, Alcorn argued that a claim for breach of contract for wrongful termination would inject a "brand new" theory into the case. Alcorn's opposition to Jones's motion for leave to amend is inconsistent with its prior motion to dismiss. Based on the relief sought in Jones's original complaint, and Alcorn's response that the complaint as "premature," we conclude that the original complaint put Alcorn on notice that Jones was alleging that his termination was a breach of his employment contract. *See MS Comp Choice SIF v. Clark, Scott & Streetman*, 981 So. 2d 955, 962 (¶23) (Miss. 2008) ("Under Rule 8 of the Mississippi Rules of Civil Procedure, it is only necessary that the pleadings provide sufficient notice to the defendant of the claims and grounds upon which relief which is sought.").

¶63.    The second reason that we conclude that leave to amend should have been granted is that Alcorn failed to show that it would be prejudiced by the amendment. Alcorn's alleged reasons for terminating Jones's employment were thoroughly explored during Jones's "due process hearing." Eight witnesses testified at the hearing, including Jones, Hamilton, and Collins, and the hearing transcript runs 395 pages. Jones then appealed his termination to the circuit court and this Court. The same lawyers have represented Alcorn throughout both cases, and Jones moved to amend his complaint five months prior to trial in this case. Alcorn fails to explain why it could not have been prepared to defend Jones's termination in this case given that it had already done so at Jones's due process hearing and in the prior appeal. Our Supreme Court has held that "[i]n practice an amendment should be denied only if the

35

amendment would cause actual prejudice to the opposite party." *TXG Intrastate Pipeline*, 716 So. 2d at 1011 (¶59).

¶64.    Alcorn asserts that Jones's proposed amendment "clearly" would have been "extremely prejudicial" because it would have "completely transformed" the case. As discussed above, we cannot agree. Alcorn itself stated in its prior motion to dismiss that Jones's wrongful termination claim involved the same nucleus of facts and circumstances as his other claims, and Alcorn had already defended the termination in an administrative hearing and appeal. Generalized or conclusory assertions of prejudice are insufficient to establish that actual prejudice will result from the amendment. *See, e.g.*, *Middle Atl. Utils. Co. v. S.M.W. Dev. Corp.*, 392 F.2d 380, 386 (2d Cir. 1968); *Town of New Windsor v. Tesa Tuck Inc.*, 919 F. Supp. 662, 677 (S.D.N.Y. 1996); *Green v. Wolf Corp.*, 50 F.R.D. 220, 223 (S.D.N.Y. 1970). Moreover, "delay alone is not sufficient reason to deny leave to amend. The delay must be accompanied by prejudice, bad faith, or futility." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509-10 (4th Cir. 1986) (collecting cases).[12]

¶65.    At the hearing in the circuit court, Jones argued that his failure to formally amend the complaint sooner to allege that his termination was a breach of his contract was, at worst, an "oversight" by counsel. As our Supreme Court has stated, "since attorneys sometimes fail to write perfect pleadings, it is necessary that courts permit liberal amendments of the

---

[12] *See also* 6 Charles Alan Wright, Arthur R. Miller et al., *Federal Practice & Procedure* § 1487 (3d ed. 2002) ("[P]laintiff typically will not be precluded . . . from adding a claim to an otherwise proper complaint simply because that amendment may increase defendant's potential liability."); *Town of New Windsor*, 919 F. Supp. at 676 ("[T]he fact that a proposed amendment is motivated by an afterthought of counsel as to the best theory upon which to proceed" will not, by itself, "suffice as [a] reason[] for denying leave to amend.").

pleadings in order to reach the actual merits of a controversy." *Simmons*, 631 So. 2d at 800-01 (alteration omitted) (quoting *William Iselin & Co. v. Delta Auction & Real Estate Co.*, 433 So. 2d 911, 913 (Miss. 1983)). This is such a case. Alcorn was on notice that Jones was alleging wrongful termination and breach of contract, all issues related to that claim were thoroughly explored in the prior case, and Alcorn fails to articulate how the amendment would cause any specific prejudice or delay. Accordingly, we hold that the denial of Jones's motion for leave to amend was an abuse of discretion.[13]

### B. Jones's prior appeal of his termination does not preclude his claim for breach of contract.

¶66. In his opening brief and reply brief and during oral argument, Jones argued that he could pursue a claim for breach of contract based on his termination despite this Court's prior decision upholding his termination. *Jones*, 120 So. 3d at 453-54 (¶16). Jones relied on our Supreme Court's decision in *Board of Trustees of State Institutions of Higher Learning v. Brewer*, 732 So. 2d 934 (Miss. 1999). In contrast, in the statement of facts of its appellate brief, Alcorn asserted that this Court's prior decision "stands as a final decision as to any

---

[13] Alcorn also argues that Jones "admitted" in his deposition that this lawsuit did not involve a claim based on his termination. However, Jones's deposition was taken in July 2015, only two weeks before he moved to amend his complaint, so Alcorn cannot claim any sort of detrimental reliance on Jones's deposition testimony. Moreover, Alcorn overstates Jones's testimony. A fair reading of the transcript shows that Jones merely acknowledged the undisputed fact that he filed this lawsuit before Alcorn had terminated him.

Finally, Alcorn argues that Jones's federal lawsuit, which was filed in 2010 and dismissed without prejudice in 2012, weighed against Jones's motion for leave to amend. However, the federal case was dismissed without prejudice based on Eleventh Amendment immunity. Alcorn fails to show how the federal case establishes prejudice or evinces bad faith on Jones's part.

claims and/or issues relating to [Jones's] termination."

¶67. Our subsequent order requiring supplemental briefs asked the parties to address whether this Court's prior decision bars Jones's wrongful termination/breach of contract claim. In his supplemental brief, Jones again relied on *Brewer* and argued that this Court's prior decision does not bar his claim. Alcorn argued that Jones's claim is barred because the doctrine of collateral estoppel generally applies to administrative proceedings and bars re-litigation of administrative decisions. *See Smith v. Univ. of Miss.*, 797 So. 2d 956, 962 (¶22) (Miss. 2001). Alcorn did not address the Supreme Court's decision in *Brewer*.

¶68. *Brewer* involved former Ole Miss football coach Billy Brewer. Ole Miss terminated Brewer in 1994 with three years left on his contract. *Brewer*, 732 So. 2d at 935 (¶1). Following the procedure set out in the university's employee handbook, Brewer appealed his termination to the athletic director, who affirmed the termination, and Brewer then exercised his right to a hearing before the university's "Personnel Action Review Board" (PARB). *Id.* at (¶2). After a "full hearing," the PARB also affirmed Brewer's termination. *Id.* Brewer then sued IHL in circuit court for damages for breach of contract. *Id.* at (¶3). IHL moved to dismiss, arguing that the circuit court lacked jurisdiction because Brewer failed to appeal his termination to the circuit court via a petition for a writ of certiorari. *Id.* The Supreme Court rejected IHL's argument in a succinct opinion, reasoning as follows:

> Brewer filed a separate suit seeking monetary damages for breach of contract after . . . his administrative remedies with the University had been exhausted. Brewer's action in circuit court was not an attempt to seek reinstatement through an appeal from the decision of the University . . . , but was instead a separate breach of contract action for damages. As Brewer points out in his brief, the circuit court has original jurisdiction over all breach of contract

38

cases. *Our notions of due process would be impugned by requiring Brewer to pursue a breach of contract claim against the Board in an administrative tribunal ultimately answerable to the Board itself and subject to the limited review of the circuit court allowed [on appeal by writ of certiorari under section 11-51-93].* As a result, we find that Brewer followed the proper procedure for initiating a breach of contract claim against [IHL] in this case by filing a complaint in the circuit court. The circuit court properly denied [IHL's] motion to dismiss for lack of jurisdiction.

*Id.* at 936-37 (¶¶6-7) (emphasis added; citations and paragraph break omitted).

¶69. In our view, the Supreme Court's decision in *Brewer* is controlling. Although the *Brewer* Court was addressing a motion to dismiss for lack of jurisdiction, the Court clearly indicated that the decision of a university "administrative tribunal," subject only "to the limited review of the circuit court allowed" on appeal by writ of certiorari, could not bar Brewer's breach of contract claim. *Id.* at 937 (¶7). Indeed, the Supreme Court considered the issue a matter of basic "due process." *Id.*

¶70. We conclude that there is no material distinction between *Brewer* and this case. It is true that Jones appealed his termination to the circuit court and this Court, whereas Brewer did not appeal the adverse decision of the university's hearing board. However, in *Brewer* the Supreme Court specifically discussed the "limited review" available in circuit court and indicated that, as a matter of due process, such review was not an adequate substitute for Brewer's right to sue for breach of contract. Moreover, the preclusive effect of an administrative proceeding, if any, stems from the administrative decision itself. *See Smith*, 797 So. 2d at 962 (¶22). Judicial review of the administrative decision does not add to its preclusive effect. Such review only assesses whether the administrative decision was "arbitrary and capricious." *See Jones*, 120 So. 3d at 453-54 (¶¶12-16).

39

¶71. We also find persuasive the Supreme Court's subsequent discussion of *Brewer* in *Smith*, 797 So. 2d at 960-62 (¶¶15-19). In *Smith*, the Court held that an appeal by writ of certiorari was the exclusive remedy for a university employee who did not have a written employment contract. *See id.* at 961, 965 (¶¶18, 29). The Supreme Court distinguished *Brewer* by explaining,

> The Court's rationale in *Brewer* was based on the fact that Brewer had a written, separately negotiated contract with the University, the terms of which were in dispute. This Court places high importance on such contractual relationships. Smith, however, had no such written contract. . . . Smith was afforded statutory protections and procedures for the purpose of appealing employment decisions, *while an employee with a separate, written contract may pursue other avenues in search of relief*.

*Smith*, 797 So. 2d at 961 (¶18) (emphasis added). The Court also reiterated that *Brewer* "was based in part on fairness concerns" and "due process." *Id.* at (¶19).

¶72. Likewise in this case, Jones "had a written, separately negotiated contract with [Alcorn]," and he alleges that Alcorn breached that contract. *Id.* at (¶18). As an employee with such a contract, he may pursue a claim for breach of contract in addition to whatever administrative remedies may be available to him. *Id.*[14]

¶73. As we read the Supreme Court's opinion, *Brewer* holds that a decision of an administrative tribunal within a university, subject to only "limited" judicial review, does not bar a subsequent action for breach of a written employment contract. *Brewer*, 732 So. 2d at

[14] An administrative hearing and appeal by petition for a writ of certiorari was the exclusive procedure by which Jones could seek reinstatement of his employment. As *Brewer* recognizes, it could be unfair to require Jones to seek reinstatement before a hearing committee of Alcorn employees appointed by Alcorn's president, subject to only limited judicial review, and then hold that the committee's decision bars any claim for breach of contract.

40

936-37 (¶¶6-7). That holding squarely applies to the facts of this case. Accordingly, we hold that this Court's prior decision in *Jones*, 120 So. 3d 448, does not bar Jones's claim for breach of contract based on his allegedly wrongful termination.

### III. The MTCA does not bar Jones's tortious interference claim against Hamilton.

¶74. In his final issue on appeal, Jones argues that the circuit court erred by dismissing his tortious interference claim against Hamilton in Hamilton's individual capacity. Relying on *Whiting v. University of Southern Mississippi*, 62 So. 3d 907, 915-16 (¶¶15-16) (Miss. 2011), the circuit ruled that such claims were subject to dismissal pursuant to the MTCA. However, while this case was pending on appeal, the Supreme Court overruled *Whiting* in relevant part and held that a claim for tortious interference with contract is not subject to the MTCA. *Springer*, 231 So. 3d at 988-89 (¶¶32-35). Such a claim may be brought against a governmental employee in his individual capacity, and the MTCA does not apply. *See id.*

¶75. Because the Supreme Court's decision in *Springer* handed down after Alcorn filed its principal brief on appeal, we permitted the parties to address this issue again in their supplemental briefs. In its supplemental brief, Alcorn asserts that the dismissal of the claim against Hamilton should be affirmed because Jones "failed to exhaust his administrative remedies before filing suit." We do not follow this argument. *Springer* clearly holds that the MTCA does not apply to a claim for tortious interference with contract. *Id.* Therefore, Jones properly filed this claim against Hamilton *in Hamilton's individual capacity*. *Id.* The MTCA and its various requirements, defenses, and exemptions do not apply to a claim properly filed against an individual employee in his individual capacity. *See Univ. of Miss. Med. Ctr. v.*

41

*Oliver*, 235 So. 3d 75, 82-83 (¶¶26-33) (Miss. 2017).

¶76. Based on the Supreme Court's recent decision in *Springer*, the circuit court erred by dismissing Jones's tortious interference claim against Hamilton. That claim simply is not subject to the MTCA. Jones adequately alleged a claim for tortious interference with contract, and he presented evidence at trial that would have supported such a claim. Accordingly, on remand, Jones may pursue an individual-capacity claim against Hamilton for tortious interference with contract.

## CONCLUSION

¶77. In summary, we hold:

(1)     Jones has a viable claim for breach of the implied covenant of good faith and fair dealing.

(2)     A breach of an express provision of the parties' contract is not a necessary condition of a claim for breach of the implied covenant of good faith and fair dealing.

(3)     A written employment contract for a definite term that is terminable only for cause contains an implied covenant of good faith and fair dealing.

(4)     The MTCA applies to a claim for breach of the implied covenant of good faith and fair dealing because, by its plain language, the Act applies to any claim for "any . . . breach of [an] implied term or condition of any . . . contract." Miss. Code Ann. § 11-46-3(1).

(5)     Such a claim is also covered by the MTCA's limited waiver of immunity because "malice" is not an essential element of the claim. Miss. Code Ann. § 11-46-5(1)-(2).

(6)     Therefore, Jones may pursue a claim for breach of the implied covenant of good faith and fair dealing under the MTCA. The Act is a complete bar to Jones's claim only to the extent that the claim is, in substance, a claim for libel, slander, or defamation. *See id.*

42

(7)     Jones's good faith and fair dealing claim must be dismissed *without prejudice* because he failed to comply with the MTCA's *pre-suit* notice requirements.

(8)     However, Jones's properly served complaint tolled the statute of limitations.  Therefore, Jones's good faith and fair dealing claim should be dismissed without prejudice to his ability to refile after he complies with the MTCA's pre-suit notice requirements.

(9)     The circuit court abused its discretion by denying Jones's motion for leave to amend his complaint to specifically assert a claim for breach of contract based on his allegedly wrongful termination.

(10)    Jones's breach of contract/wrongful termination claim is not barred by this Court's prior decision upholding his termination.  *See Brewer*, 732 So. 2d at 936-37 (¶¶6-7).

(11)    The circuit court erred by dismissing Jones's tortious interference claim against Hamilton in Hamilton's individual capacity.  *See Springer*, 231 So. 3d at 988-89 (¶¶32-35).

¶78.    The MTCA applies to Jones's claim against IHL for breach of the implied covenant of good faith and fair dealing.  On remand, assuming that Jones complies with the MTCA's pre-suit notice requirement and then refiles his good faith and fair dealing claim, "[t]he judge . . . shall hear and determine" that claim "without a jury," as required by the MTCA.  Miss. Code Ann. § 11-46-13(1).  However, Jones has a right to a jury trial on his claim against IHL for breach of the express terms of his contract (wrongful termination) and his claim against Hamilton for tortious interference with his contract.  Those claims may be submitted to a jury as part of the same trial in which the judge decides his MTCA claim.[15]

_____

[15] *See generally* M. Madison Taylor, *Resolving the Conflict Between the Bench Trial Provision of the Mississippi Tort Claims Act and the Right of Trial by Jury Under the Mississippi Constitution*, 81 Miss. L.J., Supra 21 (2011) (concluding that when a state entity is joined as a co-defendant with a private party, the plaintiff's claims generally should be tried together, with the judge rendering a decision on the plaintiff's MTCA claims and the

43

¶79.   We reverse and remand this case to the circuit court for further proceedings consistent with this opinion.

¶80.   **REVERSED AND REMANDED.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, FAIR, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR.**

---

jury rendering a verdict on the plaintiff's non-MTCA claims).